**NATURAL RESOURCES DEFENSE COUNCIL, INC., et al., Plaintiffs,**

v.

**Donald EVANS, Secretary of Commerce, et al., Defendants.**

**Nos. C 01–0421 JL, C 01–0637 JL.**

United States District Court, N.D. California.

Aug. 20, 2001.

Andrew P. Caputo, Natural Resources Defense Council, San Francisco, CA, Stephen E. Roady, Ocean Law Project, Washington, DC, Monica B. Goldberg, Eric A. Bilsky, OCEANA, Inc., Washington, DC, for Plaintiffs.

Catherine R. Lewers, U.S. Dept. of Justice, Environmental & Natural Resources Division, Washington, DC, for Defendants.

## ORDER GRANTING PARTIAL SUMMARY JUDGMENT FOR PLAINTIFFS AND DEFENDANTS

LARSON, United States Magistrate Judge.

### INTRODUCTION

Cross Motions for Summary Judgment were submitted and a hearing was conducted on August 1, 2001. Plaintiffs were represented by Andrew Caputo of the Natural Resources Defense Council, Inc. Federal Defendants were represented by Catherine R. Lewers of the U.S. Department of Justice.

For good cause appearing the court hereby grants Plaintiffs' Motion for Summary Judgment as to Counts 1, 1a, 2, 2a, 3 (in part), 3a (in part) 4, and 4a. The court hereby grants Defendants' Motion for Summary Judgment as to Counts 3 (in part) and 3a (in part).

### FACTUAL BACKGROUND

The Magnuson–Stevens Fishery and Conservation Act ("MSA") governs the management of federal fishing waters off the coast of the United States. As part of this process, the Commerce Department directs the National Oceanic and Atmospheric Administration, which in turn delegates practical management to the National Marine Fisheries Service ("NMFS"). The NMFS oversees the operations of the eight regional fishery management councils, including the Pacific Fishery Management Council ("Pacific Council"). The Pacific Council develops, among other things, annual harvest recommendations for the species of fish within its fishery, which are then subject to revision by the NMFS and formal approval by the Secretary of Commerce.

Bocaccio rockfish and lingcod are two of the 82 species of groundfish that constitute the Pacific Coast Groundfish Fishery. They serve several needs of the population and are of elemental importance to the coastal ecosystems of Washington, Oregon, and California. Pacific groundfish are generally marketed under some form of the name "snapper." Bocaccio, for example, is commonly known as "Pacific red snapper" or "rock fish." Groundfish generally mature slowly, live between 50 and 150 years, and depend greatly upon their ocean-floor habitat for survival. Unfortunately both species are imperiled. The Bocaccio population in this region, for example, is presently estimated at just 2% of its unfished biomass, having declined precipitously since 1969, largely because of overfishing. The populations of other species of groundfish are also suspected to be severely depleted, but there is no reliable data, since the NMFS has studied just 16 of these 82 species. Of the 16 studied, seven species have been officially determined to be "overfished," including bocaccio and lingcod, each of which were officially so designated in March 1999.

The M.S.A. was amended in 1996 by the Sustainable Fisheries Act ("SFA") to provide more stringent protections for overfished species, such as bocaccio and lingcod. NMFS is responsible under the M.S.A. for ensuring the protection and repopulation of these species through the implementation of rebuilding plans and its annual fishing specifications and limits. The MSA's national standards require, among other things, that NMFS's fishery management plans "prevent overfishing" and "minimize bycatch." 16 U.S.C. §§ 1851(a)(1), (a)(9).

Commercial fishing boats regularly discard the fish they catch that are either "untargeted" or would exceed their quota. These unwanted fish, known as bycatch, are returned to the sea in a process that results in various levels of mortality for different species. Because of the trauma associated with pressure change, few bocaccio survive after being brought to the surface, leading to a discard mortality rate approaching 100%.

An irony exists in that as fishing allowances are lowered to protect a species, the bycatch percentage increases. Fishing boats continue to catch multiple species of fish at the same time, but they are compelled by regulation to discard a greater percentage of the protected species. As bocaccio and lingcod fishing allowances have decreased in recent years, it is therefore, as both sides agree, a virtual certainty that the bycatch mortality rates for each fish have in turn increased. NMFS acknowledges that it does not have accurate data on bycatch, that the issue is of "serious concern," but that it is "taking steps" to address this lack of information. Without such data, it is extremely difficult to assess the efficacy of NMFS's conservation and management measures, which has resulted in the continued overfishing of lingcod and bocaccio.

NMFS sets fishing limits each year in its annual groundfish specifications. The M.S.A. requires that the Pacific Management Fishery Council ("Council") "conduct public hearings ... so as to allow interested persons an opportunity to be heard" regarding the development of plans, amendments, and Council decisions. 16 U.S.C. § 1852(h)(3). Prior to its 2001 specifications, the Council held two series of meetings, the first on September 11–15, 2000 in Sacramento, California, and the second between October 30 and November 3, 2000 in Vancouver, Washington. At the meetings, the Council received public comment and accepted written comments from NRDC and other interested parties during October 2000, in accordance with 16 U.S.C. § 1852(h)(3). After the November meeting, the Council prepared an Environmental Assessment ("EA"), in accordance with the National Environmental Policy Act ("NEPA"), along with its final 2001 groundfish specification recommendations and forwarded them to NMFS on December 13, 2000. That same day, NMFS requested approval of the specifications from the National Oceanic and Atmospheric Administration, NMFS parent body, and approval was granted on January 2, 2001. The 2001 specifications were filed, in final, legally binding form, with the Office of the Federal Register on January 5, 2001 and published on January 11 with public comment invited until February 12, 2001.

NMFS failed to include bocaccio and lingcod discard-mortality rates in setting its final 2001 groundfish specifications and catch limits on January 5, 2001, thus putting these already "overfished" species at decided risk of further overfishing. In an attempt to correct this oversight, NMFS later adjusted its bocaccio and lingcod fishing limits in May 2001, to account for an estimated 16% and 20% bycatch mortality rate, respectively.

## PROCEDURAL HISTORY

Plaintiffs, Natural Resources Defense Council, Pacific Marine Conservation Council, and The Ocean Conservancy (collectively, "NRDC") and Defendants, NMFS, under the aegis of United States Secretary of Commerce Donald Evans, have filed cross motions for summary judgment in these consolidated actions.

The NRDC states four claims and prays for eight orders of declaratory and injunctive relief:

- 1. Declaratory judgment that NMFS's revised 2001 specifications for bocaccio rockfish and lingcod fishing limits violates the M.S.A. and the Administrative Procedure Act ("APA") by failing to adequately account for discard mortality;
- 1a. An order that NMFS reassess its 2001 specifications using a legally adequate consideration of discard mortality;
- 2. Declaratory judgment that NMFS violated the M.S.A. and the APA by not providing prior public notice and allowing for comment on the 2001 specifications after their publication by the Secretary;
- 2a. An order that, in accordance with the M.S.A. and the APA, NMFS provide prior public notice and allow comment on future Pacific groundfish specifications;
- 3. Declaratory judgment that NMFS's Amendment 12 violates the M.S.A. by authorizing inadequate rebuilding plans for overfished species and continued overfishing under a "mixed-stock" exception;
- 3a. An order setting aside Amendment 12 and remanding it to NMFS for further consideration;
- 4. Declaratory judgment that the EAs NMFS performed in conjunction with Amendment 12 and the 2001 groundf-

ish specifications failed to consider a reasonable range of alternatives and environmental consequences, in violation of NEPA;

- 4a. An order setting aside and remanding the EAs performed in conjunction with Amendment 12 and the 2001 groundfish specifications to NMFS.

NMFS seeks summary judgment as to all counts of NRDC's complaint.

## ANALYSIS

### I. NMFS's 2001 Groundfish Specifications Violate the MSA.

NMFS argues that NRDC's first claim is not properly before the court, suggesting the issue is moot after NMFS's May 2001 adjustment of bocaccio and lingcod specifications to include 16% and 20% discard mortality rates. NRDC's consolidated complaints, however, do not just rely on specific percentages; they allege a fundamentally unreasoned process under which NMFS's 2001 specifications were set, and this allegation remains relevant. It is therefore unnecessary to amend the pleadings in accordance with Federal Rule of Civil Procedure 15(b).

The first of NRDC's four primary contentions is that NMFS 2001 groundfish specifications violate both the M.S.A. and the APA by using inadequate bocaccio and lingcod discard mortality rates of 16% and 20%. The 16% figure NMFS uses is derived from the Pikitch Study, a survey of commercial groundfish discard rates conducted along the Oregon and Washington coasts between 1985 and 1987. Neither bocaccio nor lingcod were actually involved in the Pikitch Study, and NRDC contends that the results of a 15–year–old study on other groundfish cannot reasonably be said to apply to bocaccio and lingcod in 2001. Because the fishing limits have been reduced for bocaccio and lingcod since the

Pikitch Study, NMFS admits that it is a "virtual certainty" that their bycatch mortality rates have risen. NRDC contends that this makes NMFS reliance on 15–year–old data unreasonable.

█ The M.S.A. confines the scope of judicial review of agency regulations and actions as provided in 5 U.S.C. § 706(2)(A), (B), (C), or (D) of the APA. 16 U.S.C. § 1855(f)(1)(B). Section 706 of the APA requires reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency decision may be invalidated if it fails to consider important aspects of a problem, uses criteria Congress did not intend, or is not explained adequately enough for a reviewing court to identify the agency's response to major policy issues raised in preliminary proceedings. *Alvarado Community Hosp. v. Shalala,* 155 F.3d 1115, 1122 (9th Cir. 1998).

NMFS counters that the Pikitch Study represents the best scientific evidence available in 2001 and that estimated total commercial catches for both species in 1999 and 2000 did not exceed even the admittedly faulty January 2001 specifications. So by employing the same 16% and 20% bycatch mortality rates in 2001 as it did in 1999 and 2000, NMFS argues, there has been no overfishing. But NMFS has no accurate data on bycatch, so it does not actually know if there was overfishing during 1999 and 2000.

There are other problems with relying on the Pikitch Study. Data from the study suggest various discard rates for different groundfish, including one at 52%. Since neither bocaccio nor lingcod were actually included in the Pikitch Study, it would be reasonable to expect NMFS to explain why assigned a 16% rate of bycatch for bocaccio rather than a higher percentage

up to 52%. The Pikitch Study also corroborates evidence that regulatory bycatch increases as landing limits are reduced, and both bocaccio and lingcod have been protected by reduced landing limits. It must follow that bycatch discard has increased since the Pikitch Study was conducted and that the 16% and 20% figures NMFS has arbitrarily set are no longer accurate, if they ever were.

The 1996 SFA amendments to the M.S.A. require that the NMFS "establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery and . . . minimize bycatch." 16 U.S.C. § 1853(a)(11)(A). NMFS has not done this. Evidence that neither side disputes points to increasing bycatch percentages for bocaccio and lingcod as landing limits necessarily decline to protect the species. NMFS has not accounted for this evidence of increased bycatch percentages in its specifications, instead using static estimates that are 15 years old. NMFS has not observed to its duty to obtain accurate bycatch data. Nor has the agency bothered to explain its decision to ignore these factors and not adjust bocaccio and lingcod bycatch percentages in the face of evidence that it should.

█ NRDC's request that the 2001 bocaccio and lingcod specifications be declared a violation of NMFS's duty under the M.S.A. to address bycatch mortality is hereby granted. NMFS failed to "include conservation and management measures that . . . (A) minimize bycatch; and (B) minimize the mortality of bycatch which cannot be avoided." 16 U.S.C. § 1853(a)(11). They are thus "not in accordance with law." 5 U.S.C. § 706(2)(A). The specifications are remanded to NMFS for further consideration under a legally sufficient standard that accounts for the unrefuted evidence of increased bycatch

mortality or sufficiently explains the agency's decision to disregard such evidence. This court is not directing that NMFS arrive at a specific harvest yield or bycatch percentage the court thinks is appropriate, only that it meet its obligations under the M.S.A. and the APA to engage in reasoned decision-making.

## II. NMFS 2001 Specifications are Legally Binding Regulations and Must be Offered for Public Notice and Comment.

NRDC next claims that NMFS violated the M.S.A. and APA by not accepting public comment on its 2001 Pacific groundfish specifications. The M.S.A. requires that the Secretary of Commerce publish regulations proposed under 16 U.S.C. § 1853(c) in the Federal Register and receive public comment on them for a period of 15 to 60 days. 16 U.S.C. § 1854(b)(1)(A). Proposed regulations implement a fishery management plan, plan amendment, or modifications to regulations. 16 U.S.C. § 1853(c). Groundfish specifications are legally binding, and NMFS has previously admitted in a variety of circumstances that its annual specifications in fact constitute "regulations" under 16 U.S.C. §§ 1854(b)(1) and 1853(c)(1). NMFS currently argues, however, that its annual specifications are not "regulations," but rather "rules" or "framework actions," and so are not subject to the public notice and comment provisions of 16 U.S.C. § 1854(b)(1)(A).

In support of this contention, NMFS cites the judicial review section of MSA, 16 U.S.C. § 1855(f) and the distinction drawn there between "[r]egulations promulgated by the Secretary and ... actions that are taken by the Secretary under regulations which implement a fishery management plan ...." NMFS claims that its annual groundfish specifications are "actions taken by the Secretary" rather than "[r]egulations promulgated by the Secretary," and

that the public notice and comment provisions of 16, U.S.C. § 1854(b) apply only to "regulations" and not to "actions."

While this particular question appears to be an issue of first impression, at least one other court has spoken on the matter of what constitutes a "regulation." As employed by the MSA, a regulation "refers to legally binding obligations which have the force and effect of law and carry with them the threat of civil penalties, citations and/or vessel forfeitures." *Tutein v. Daley,* 43 F.Supp.2d 113, 121 (D.Mass.1999) (distinguishing between MSA's "advisory guidelines" and "regulations"). As noted, NMFS does not dispute that its 2001 groundfish specifications place legally binding obligations on the public, but the agency maintains that while they carry the force and effect of law, its specifications are "rules" or "framework actions."

█ The section of M.S.A. that NMFS relies on to support interpretation does not contain the term "framework management process." Section 1855(f)(2), in fact, enhances the standing of affected parties to file judicial challenges to agency actions that occur after MSA's 30–day statute of limitations has lapsed. The legislative history cited by NMFS and NRDC further indicates that Congress did not intend to establish an exemption from public notice and comment for certain "actions," but rather to ensure that such actions remain open to judicial challenge despite the tolling of the statute of limitations. Sen. Rpt. 101–414 (1989) (reprinted in 1990 U.S.C.C.A.N. 6276, 6298). NMFS argument takes Congress' express language extending public and judicial oversight of agency action out of its context and turns it against its very purpose.

More problematic to NMFS interpretation of annual specifications as legally binding "actions" or "rules" but not "regulations" is the scope of agency action that

would fall outside the requirements of public notice and comment. In passing the MSA, Congress evinced a clear determination that public notice and comment should be required for regulations promulgated by the Secretary. 16 U.S.C. § 1854(b). NMFS annual specifications include fishery harvest quotas, guidelines, economic considerations, equipment regulations, and the creation of protected areas. These are some of the most significant actions that the agency takes. NMFS would take these legally binding decisions out of the realm of public notice and comment prior to their enactment.

NMFS rightly points out that it does promote public access to the Pacific Council, a body subordinate to NMFS, during its annual meetings in September and November. However, this argument ignores the importance of the hierarchical structure established by MSA. Presumably NMFS and the Secretary of Commerce do not simply rubber stamp whatever recommendations are made to them by the Council, and the opportunity for the public to address its grievances and concerns directly to the Secretary, under 16 U.S.C. § 1854(b), ensures public access to Council review. Denying the public access to this specially created avenue of appeal, based on NMFS strained statutory reading of the law is difficult to abide.

It should be noted here that the case at bar presents a striking example of the need for such a forum. NMFS suggests that NRDC's access to the September and November Pacific Council meetings was sufficient to raise concerns. Yet NMFS oversight in not including bocaccio and lingcod discard-mortality rates in its January 2001 specifications was not corrected until May 2001. Had the error been brought to the Secretary's attention before the specifications were formally enacted, during a public notice and comment period, the specifications could have been amended earlier at less risk to the overfished species.

### a. Even as "Rules," NMFS Specifications Are Subject to APA Notice and Comment Provisions.

■ Even if NMFS contention that its 2001 groundfish specifications are "rules" and not "regulations" were persuasive, the specifications would still be subject to the standard public comment and notice provisions of the APA. Proposed agency "rule making" must be published in the Federal Register at least 30 days before enactment. 5 U.S.C. § 553. NMFS concedes that as "rules" its specifications would normally be subject to the APA. NMFS, however, invokes the "good cause" exception of 5 U.S.C. § 553(b)(B), which allows an agency to bypass public comment and notice if it would be "impracticable, unnecessary, or contrary to the public interest." NMFS maintains that its annual specifications are so time sensitive that it cannot provide this notice and comment period and implement the specifications in time for the January 1 commencement of each year's fishing season.

When evaluating an agency's invocation of the good cause exception to avoid public comment and notice, Ninth Circuit law "requires APA exceptions to be construed narrowly . . . ." *Independent Guard Ass'n of Nevada, Local No. 1 v. O'Leary*, 57 F.3d 766 (9th Cir.1995). Valid exceptions to notice and comment provisions usually involve circumstances in which an agency would otherwise be unable to execute its statutory obligations. *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1484 n. 2 (9th Cir.1992). In that case the defendant agency held public meetings every Tuesday to establish volume restrictions on the next week's navel orange market, with the Secretary of Agriculture issuing the actual ruling each Friday. *Id.* at 1483. Notice of

the meetings was not published in the Federal Register, nor did the Secretary receive public comment before issuing the weekly rule, on the basis of the "good cause" exception of impracticability provided for in 5 U.S.C. § 553(b)(B). *Id.* The court held that there was no "good cause" for not publishing advance notice in the Federal Register before each weekly meeting and allowing public submission of written comments to the Secretary to the extent possible. *Id.* at 1489.

In our case, two months passed between the conclusion of the Pacific Council's second meeting in November 2000, in which the 2001 specifications were set, and their enactment by the Secretary in January 2001. Even with the time required to conduct an EA, there was sufficient time for the Secretary to publish and receive comment on proposed specifications 30 days before their enactment. The proposed specifications need not purport to be final when submitted for public comment; they need only set forth what has been proposed by the Council to the Secretary. Moreover, these specifications are set once per year, not weekly as in *Riverbend Farms*, under a predictable schedule of meetings and procedures, and the importance of public participation in agency rule-making should not be ignored for the mere sake of convenience. And since this court directs that the NMFS re-adopt its former interpretation that groundfish specifications are in fact "regulations" under MSA, 15 days is the minimum required to satisfy the public's legitimate interests. 16 U.S.C. § 1854(b).

Whether characterized as "regulations," "rules," or "framework actions," NMFS annual groundfish specifications carry the weight of law, and NMFS has not demonstrated that it is impractical that they be submitted to public notice and comment. NRDC's request for declaratory judgment that NMFS's 2001 specifications violate the M.S.A. (and, alternatively, the APA) is hereby granted, and NMFS is ordered to comply with public notice and comment provisions of the M.S.A. in setting future groundfish specifications.

## III. NMFS Amendment 12 Violates M.S.A. by Authorizing Inadequate Rebuilding Plans.

NRDC's third claim challenges the legality of NMFS Amendment 12 because its form and content do not comply with M.S.A. and because its reservation of a "mixed-stock exception" violates MSA's mandate to prevent overfishing. Both sides agree that Amendment 12 is not itself a "rebuilding plan" for overfished fisheries but rather a mechanism employed in the development of rebuilding plans. Amendment 12 does specify, however, that any rebuilding plan subsequently developed by NMFS will not take the form of a fishery management plan, plan amendment, or regulations. This does not accord with the requirements of MSA.

As noted, the M.S.A. was amended in 1996 by the SFA to include provisions for rebuilding overfished species such as bocaccio and lingcod. 16 U.S.C. § 1854(e). Once the Secretary determines a fishery has become overfished, the appropriate regional Council must take action "to end overfishing in the fishery and implement conservation and management measures to rebuild affected stocks of fish." 16 U.S.C. § 1854(e)(2). This action "shall" take the form of "a fishery management plan, plan amendment, or proposed regulations" designed "to end overfishing in the fishery and to rebuild affected stocks of fish." 16 U.S.C. § 1854(e)(3). The management plan, amendment, or regulations must end overfishing as quickly as possible, consider needs of fishing communities, and allocate benefits and restrictions fairly. 16 U.S.C. § 1854(e)(4). These plans must be re-

viewed every two years by the Secretary to ensure adequate progress in rebuilding overfished stocks. 16 U.S.C. § 1854(e)(7).

 By its own admission NMFS Amendment 12 specifically authorizes the development of rebuilding plans or actions that fail to take the required form of "a fishery management plan, plan amendment, or proposed regulations." 16 U.S.C. § 1854(e)(3). The M.S.A. is unequivocal about the form these agency actions must take to protect overfished species. NMFS, however, construes this language as support for its "framework action" process, an interpretation that affords the agency power to bypass public notice and comment on these legally binding "actions." MSA could hardly be more clear about the form that rebuilding plans and actions must take, and Amendment 12 expressly authorizes forms of action that run directly contradict the unambiguous provisions of MSA. It is thus "not in accordance with law." 5 U.S.C. § 706(1)(A). Declaratory judgment that Amendment 12 violates the M.S.A. by authorizing inadequate rebuilding plans for overfished species is hereby granted. This portion of Amendment 12 is remanded to NMFS for further proceedings in conformity with 16 U.S.C. § 1854(e)(3).

### a. NRDC's Challenge to Amendment 12's Mixed–Stock Exception is not Ripe for Judicial Review.

 NRDC also disputes the legality of Amendment 12's inclusion of a mixed-stock exception that permits overfishing should certain precautionary conditions be met. To date, NMFS has not applied this exception, and Amendment 12 refers to a pre-existing mixed-stock exception in the National Standard Guidelines related to National Standard One. 16 U.S.C. § 1851(a)(1).

The SFA amendments of 1996 strengthened the MSA's measures to prevent overfishing. National Standard One requires that any fishery management plan or regulation "prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery ...." 16 U.S.C. § 1851(a)(1). The MSA's National Standards require the Secretary to "establish advisory guidelines (which do not have the force and effect of law)... to assist in the development of fishery management plans." 16 U.S.C. § 1851(b). The mixed-stock exception was developed under these advisory guidelines, and Amendment 12 provides that "[i]n limited circumstances, [adjustments to the optimum yield] could include increasing OY above the overfishing level as long as the harvest meets the mixed-stock exception in the National Standard Guidelines." 2 AR B.19, Append. at 4. The guidelines permit overfishing "only if all of the following conditions are satisfied: (i) It is demonstrated by analysis ... that such actions will result in long-term net benefits to the nation. (ii) It is demonstrated by analysis that mitigating measures have been considered ... (iii) The resulting rate or level of fishing will not cause any species ... to require protection under the ESA." 50 C.F.R. § 600.310(d)(6).

The 1996 amendments to the M.S.A. included a specific definition of the term "overfished," a mandate to rebuild overfished fisheries, and a change in the definition of "optimum" to minimize aggressive harvest yields. NRDC argues that this is evidence of Congress intent to eliminate the mixed-stock exception. However, Congress neither expressly sanctioned nor prohibited future application of the mixed-stock exception that was in place in 1996. NMFS contends the issue is not ripe for judicial review because the mixed-stock exception has not been applied and, as yet, imposes no legally binding regulations.

The two-part test for ripeness requires the court to consider "(1) whether the issues are fit for judicial decision, and (2) whether the parties will suffer hardship if [the court] decline[s] to consider the issues." *City of Auburn v. Qwest Corp.,* 247 F.3d 966, 976 (9th Cir.2001). A case or controversy is fit for judicial review when "essentially legal in nature" and "no further factual amplification is necessary." *Id.* at 977 (quoting *Western Oil & Gas Ass'n v. Sonoma County,* 905 F.2d 1287, 1291 (9th Cir.1990)). In the case at bar, the circumstances under which NMFS might apply the mixed-stock exception are wholly speculative. The conditions that must be met are onerous and would presumably involve exceptional circumstances. The mixed-stock exception might be applied temporarily to a species that is not designated as "overfished;" it might be applied for valid environmental, non-economic reasons. The particular facts underlying any NMFS decision to invoke the mixed-stock exception might bear significantly on the appropriateness of such a decision. Accordingly, the issue is not currently appropriate for judicial review.

In order to constitute hardship, "[p]ostponing review must impose a hardship on the complaining party that is immediate." *Anchorage v. United States,* 980 F.2d 1320, 1326 (9th Cir.1992). NMFS has not invoked the mixed-stock exception, and there are no legally controlling rules or regulations to which the public must adhere. The second element of the test for ripeness is also unmet.

NRDC has failed to meet either part of the test for ripeness. Accordingly, NMFS motion for summary judgment that the issue of Amendment 12's inclusion of a mixed-stock exception is not ripe for adjudication is hereby granted. There will be no order remanding that portion of Amendment 12 to NMFS for further review at this time.

This ruling should not be construed to endorse the application of a mixed-stock exception to overfished fisheries. NMFS may in fact have difficulty reconciling future application of the a mixed-stock exception with its own past statement that "short-term overfishing that causes populations to decline below [maximum-sustainable and optimum yields] is not permissible." 63 FR 24216. But that is not for this court to decide at this time.

## IV. NMFS Environmental Assessments Inadequately Consider Reasonable Alternatives.

NRDC's fourth claim is that the environmental assessments ("EA") that NMFS performed for Amendment 12 and the 2001 groundfish specifications do not comport with NEPA's required consideration of alternatives and environmental consequences.

NEPA demands that federal agencies, to the extent possible, examine the effects of their decisions before acting, in order to minimize negative unintended consequences. *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1216 (9th Cir.1998). See also *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). An agency may prepare an EA and determine that a more thorough environmental impact statement ("EIS") is unwarranted and instead produce a finding of no significant impact ("FONSI"). 40 C.F.R. § 1501.4. Whether conducting an EIS or a more general EA, NEPA mandates that federal agencies "[s]tudy, develop, and describe alternatives to recommended courses of action in any proposal which involves conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). Any EA "[s]hall include a brief discussion of alternatives ...." 40 C.F.R. § 1508.9(b). "Consider-

ation of alternatives is critical to the goals of NEPA even where a proposed action does not trigger the EIS process." *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1228–29 (9th Cir.1988).

■ In formulating its EA on the 2001 bocaccio and lingcod specifications, NMFS considered two alternatives for setting by-catch mortality rates: zero and the 16% and 20%, respectively, set in previous years. As mentioned above, NMFS acknowledges that these figures are no longer accurate, if indeed they ever were. Thus, any meaningful consideration of alternatives must include the prospect of raising these percentages to provide adequate protection of these overfished species. NMFS considered two figures for bycatch, each of which it knew to be inaccurate. This kind of consideration of alternatives not does not amount to the kind of "hard look" that NEPA requires an agency to take, and NMFS has failed to explain its reasoning on the matter.

NMFS EA for Amendment 12 also considered only two alternatives in addressing the procedures for establishing rebuilding plans for overfished fisheries: 1) the status quo and 2) the agency's own proposed Amendment 12. 2 AR B.19 at EA/RIR–3. NRDC offered at least four alternatives to NMFS before the agency adopted Amendment 12, each addressing the inadequacy of rebuilding plans for overfished fisheries that the amendment would authorize. 7 AR M.50 at 3. As NMFS own counsel suggests, "the EA supporting Amendment 12 is extremely weak because it only considered the status quo and the preferred alternative." 4 AR E.6. An agency's EA need not address every conceivable alternative presented to it, but, as noted, it must at least "[s]tudy, develop, and describe appropriate alternatives ...." 42 U.S.C. § 4332(2)(E). NMFS's Amendment 12 EA addressed none of NRDC's proposed alternatives it did not explain

this failure to do so, nor did it offer any appropriate alternatives of its own.

Accordingly, NMFS EA for its 2001 bocaccio and lingcod specifications and its EA for Amendment 12 are hereby declared inadequate and remanded to the agency for compliance with NEPA's demand that it "[s]tudy, develop, and describe appropriate alternatives ...." 42 U.S.C. § 4332(2)(E).

## CONCLUSION

Judicial review of agency decision-making is appropriately circumscribed by statutes such as the APA, the MSA, and NEPA. The role of the judiciary in this regard is not to substitute its own policy considerations for those of an agency. Rather, the role of the courts is to ensure that agencies governed by the executive follow the express statutory mandates enacted by the legislature. In this regard, the NMFS has failed to adhere to the aforementioned provisions of the APA, the MSA, and NEPA, and, accordingly,

The court hereby grants the following relief:

- 1. Declaratory judgment that NMFS's revised 2001 specifications for bocaccio rockfish and lingcod fishing limits violates the M.S.A. and APA by failing to adequately account for discard mortality;

- 1a. An order that NMFS reassess its 2001 specifications using a legally adequate consideration of discard mortality;

- 2. Declaratory judgment that NMFS violated the M.S.A. and the APA by not providing prior public notice and allowing for comment on the 2001 specifications after their publication by the Secretary;

- 2a. An order that, in accordance with the M.S.A. and the APA, NMFS pro-

vide prior public notice and allow comment on future Pacific groundfish specifications;

● 3. Declaratory judgment that Amendment 12 violates the M.S.A. by authorizing inadequate rebuilding plans for overfished species;

● 3a. An order setting aside that portion of Amendment 12 that authorizes rebuilding plans that do not accord with the M.S.A. and remanding it to NMFS for further consideration;

● 4. Declaratory judgment that the Environmental Assessments NMFS performed in conjunction with Amendment 12 and the 2001 bocaccio and lingcod groundfish specifications failed to consider a reasonable range of alternatives and environmental consequences, in violation of NEPA;

● 4a. An order setting aside and remanding the EAs performed in conjunction with Amendment 12 and the 2001 groundfish specifications to NMFS.

The court hereby grants to NMFS the following:

● 3. Declaratory judgment that the issue of Amendment 12's inclusion of a "mixed-stock exception" is not yet ripe for adjudication;

● 3a. An order allowing the "mixed-stock exception" of Amendment 12 to stand, subject to any revisions NMFS implements after conducting an adequate EA in conjunction with 4a *supra;*

Plaintiffs' Motion to Strike Defendants' Answer is denied, as moot.

This order resolves Documents Number 9 and 18 of the court's docket.

IT IS SO ORDERED.