CONSERVATION LAW FOUNDATION, et al.

v.

UNITED STATES DEPARTMENT OF COMMERCE, National Oceanic and Atmospheric Administration, National Marine Fisheries Services, and Intervenor Fisheries Survival Fund [1]

No. CIV.A.01CV10927RGS.

United States District Court,
D. Massachusetts.

Oct. 31, 2002.

1. On September 10, 2001, the court allowed the motion by the Fisheries Survival Fund to intervene as a defendant.

Stephen H. Burrington, Conservation Law Foundation, Boston, MA, for Plaintiff.

Anton P. Giedt, U.S. Attorney's Office, Boston, MA, John P. Almeida, U.S. Department of Justice, Environmental and Natural Resources, General Litigation Section, Mauricia M. Baca, U.S. Dept of Justice, Washington, DC, H. Reed Witherby, Smith & Duggan, Boston, MA, Brand, Lowell & Ryan, P.C., Jason S. Hadges, Brand & Frulla, Washington, DC, for Defendants.

## MEMORANDUM AND ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

STEARNS, District Judge.

On May 31, 2001, Oceana, Inc. (f/k/a the Conservation Law Foundation), brought

this Complaint objecting to the May 2001 adoption by the National Marine Fisheries Service (NMFS) of Framework Adjustment 14 (Framework 14) to the Atlantic Sea Scallop Fishery Management Plan (Scallop Plan).[2] Framework 14 regulates scalloping in Atlantic coastal waters during the 2001 and 2002 fishing seasons.[3] While the dispute is framed largely around an alleged procedural lapse by the NMFS, plaintiffs' ultimate goal is an injunctive order barring scallopers from the Great South Channel[4] "in order to protect the groundfish habitat and minimize groundfish bycatch." In promulgating Framework 14, the Secretary of Commerce (Secretary) declined to expand the scope of his prior closure orders.[5]

█ Despite the many pages of briefing this case has generated, plaintiffs' procedural argument rests on the claim that Framework 14 was unlawfully implemented because the Secretary failed to provide the minimum 15 days for public comment required by section 304(b)(1)(A) of the Magnuson–Stevens Act, 16 U.S.C. § 1854(b)(1)(A). This section provides that:

> (1) Upon transmittal by the Council to the Secretary of proposed regulations prepared under section 1853(c) of this title, the Secretary shall immediately initiate an evaluation of the proposed regulations to determine whether they are consistent with the fishery management plan, plan amendment, this chapter and other applicable law. Within 15 days of initiating such evaluation the Secretary shall make a determination and -

> (A) if that determination is affirmative, the Secretary shall publish such regulations in the Federal Register, with such technical changes as may be necessary for clarity and an explanation of those changes, for a public comment period of 15 to 60 days; . . .

Section 1853(c) requires that a Council submit for the Secretary's review any proposed regulation that it "deems necessary or appropriate" for "(1) implementing a fishery management plan or plan amend-

---

**2.** The Magnuson–Stevens Fishery Conservation and Management Act of 1976, 16 U.S.C. §§ 1801–1883, as subsequently amended by Congress in 1990 and 1996, delegates to the NMFS, by and through the Secretary of Commerce, the authority to manage and conserve U.S. coastal fisheries. The authority of the Secretary is shared with eight Regional Fishery Management Councils who are responsible for the development of Fishery Management Plans like the Scallop Plan. A fuller description of the workings of the Act can be found in *A.M.L. International v. Daley*, 107 F.Supp.2d 90, 93 (D.Mass.2000).

**3.** Scallops are bottom-dwelling mollusks that are typically fished by dredging, a technique that is often destructive to the seabed. Hence, the scalloping industry has been a focus of intense scrutiny by conservation groups.

**4.** In their Complaint, plaintiffs argued that NMFS should have adopted Option 1 to the Scallop Plan calling for the closure of the Southeast part of Georges Bank, the Great

South Channel, the New York Bright, and Delmarva. These four areas have gravel or sandy bottoms particularly susceptible to damage from dredging. At oral argument, plaintiffs scaled back the request for injunctive relief, seeking only the closing of the Great South Channel. The Channel separates the western part of Georges Bank from the Nantucket Shoals.

**5.** On September 12, 2002, the court asked the parties to brief the issue of whether the reopening of the amendment process by the Secretary had effectively mooted their dispute over Framework 14. After reviewing the responsive submissions, I am satisfied that plaintiffs' challenge to Framework 14 remains justiciable. Framework 14 will expire on February 28, 2003. Plaintiffs reasonably request an expedited decision on the pending cross-motions for summary judgment in light of *Gulf of Maine Fisherman's Alliance v. Daley*, 292 F.3d 84, 89–90 (1st Cir.2002).

ment ... [or] ... (2) making modifications to regulations implementing a fishery management plan or plan amendment ... after the plan or amendment is approved under section 1854 of this title." A regulation is to be distinguished from a framework adjustment. A framework adjustment is an administrative procedure permitting "quick, efficient changes to [Fishery Management Plans] as the need arises."[6] Defendants' Consolidated Memorandum, at 9–10. *See Southern Offshore Fishing Ass'n v. Daley,* 995 F.Supp. 1411, 1419 (M.D.Fla.1998). A framework adjustment is typically implemented without the observance of the formalities of notice and public comment mandated by section 1854(b)(1)(A). Framework 14 was so implemented after a finding by the New England Regional Fishery Management Council that its publication as a proposed regulation was neither "necessary [n]or appropriate." *See* 50 C.F.R. § 648.55(g)(1) & (2). Consequently, Framework 14 was published as a final rule by the Secretary's "action."

NMFS, relying on the literal wording of the statute, maintains that section 1854(b)(1)(A) mandates public comment only when a Regional Fishery Management Council submits a "proposed regulation" pursuant to section 1853(c), and not when a framework adjustment to a Fishery Management Plan is implemented by an "action taken by the Secretary," as was the case with Framework 14. Whether the Secretary, despite custom and practice, is required by section 1854(b)(1)(A) to publish any interim change to a Fishery Management Plan as a "proposed regulation" is at the core of the parties' dispute. Plaintiffs' argument on this score rests on the holding of *Natural Resources Defense Council v. Evans,* 168 F.Supp.2d 1149 (N.D.Cal.2001) (*NRDC*), which in turn relied on *Tutein v. Daley,* 43 F.Supp.2d 113, 121 (D.Mass.1999), for the proposition that there is no statutorily meaningful distinction between a proposed regulation and an action taken by the Secretary, at least insofar as the notice and public comment requirements of section 1854(b)(1)(A) are concerned.[7] In reaching this conclusion, the *NRDC* court adopted *Tutein's* definition of a regulation as "a legally binding obligation having the force of law," and then reasoned that because an action taken by the Secretary is legally binding, Congress must have meant the terms to serve as functional equivalents, at least for purposes of section 1854(b)(1)(A).

The nod to *Tutein,* however, is somewhat misdirected. The issue in *Tutein* was whether a non-binding advisory guideline issued under section 1851(b) of the Magnuson–Stevens Act constituted a "reg-

6. The regulation setting out the abbreviated procedure for adopting a framework adjustment to the Scallop Plan is codified at 50 C.F.R. § 648.55.

7. Plaintiffs also rely on the legislative history of § 1853(c) as support for the proposition that the public comment period was intended to apply to framework adjustments. As stated in the Senate Report:

> [i]n recent years, Councils have increased their use of framework fisheries management plans that rely on regulations to establish fishery parameters like season opening and closures, catches, and allocations of harvest among sectors of a fishery ....

> [T]his subsection, along with changes made in section 110 of the reported bill [later codified at 16 U.S.C. § 1854] would establish streamlined procedures for consideration and approval of all regulations submitted by a Council to the Secretary.

S. Rep. No. 104–276 at 18–19 (1996), reprinted in U.S.C.C.A.N. 4091. Legislative history is not a preferred tool of construction when, as is the case here, the meaning of the words of a statute are plain, while those of its authors are not. *Cf. Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 476, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992).

ulation" subject to judicial review under section 1855(f). The Magistrate Judge in *Tutein*, noting that the Act specifically states that an advisory guideline "shall not have the force and effect of law," quite sensibly concluded that an advisory guideline was not a regulation and therefore not subject to judicial review. It does not follow from this premise, however, that because Congress made all legally binding actions the subject of judicial review, the word "regulation" as used in the Act also means "action."[8]

■ Section 1855(f) clearly recognizes that "actions taken by the Secretary" and "regulations promulgated by the Secretary," are distinct regulatory events, thus evincing Congress's understanding of and acquiescence in the difference.[9] Plaintiffs counter that the distinction, while real, is besides the point as section 1855(f) is concerned with judicial review and not with notice and comment. Plaintiffs point out that the *NRDC* court rejected any argument based on the section 1855(f) distinction as taking "Congress' express language extending public and judicial oversight of agency action out of its context and turn[ing] it against its very purpose." *NRDC*, 168 F.Supp.2d at 1155. The point presumably is that because section 1855(f), as amended, expanded the scope of judicial review, it reflects an overriding purpose of Congress to involve the public intensively in the implementation of the Act. Consequently, using section 1855(f) as a blunt instrument to insulate actions taken by the Secretary from public comment does vio-

lence to that very purpose. While this may seem plausible, it presumes that Congress indeed had such an overriding purpose. It would seem just as plausible that Congress may have thought public comment a more useful check on a regulation proposed by a politically unaccountable Council than on an action taken by a politically answerable Secretary. Congress may also well have believed that there was some value in expediting the implementation of adjustments to a Fishery Management Plan whose implementing regulations were already in place, particularly in light of the vagaries inherent in managing a complex and volatile ecosystem. Nonetheless, whatever Congress may have had in mind, the fact remains that section 1855(f) draws a clear distinction between "[r]egulations promulgated by the Secretary" and "actions that are taken by the Secretary [implementing] a fishery management plan." Under the rules of statutory construction, when Congress uses the same word in separate sections of a statute to describe the same subject matter, the word is presumed to have been used with the same meaning in each section. Thus, a regulation for purposes of section 1854 is a regulation for purposes of section 1855(f), and not both an action and a regulation for purposes of one section but not for purposes of the other. If Congress had intended section 1854(b)(1)(A) to apply to actions as well as to proposed regulations, it would have had no difficulty in saying so. It did not, and therefore the 15 day public comment period of section 1854(b)(1)(A)

8. The syllogism is based on an apparent logical fallacy, *i.e.*, all priests are men, George Washington was a man, therefore George Washington was a priest. Simply because two things share a defining characteristic, it does not follow that they are necessarily identical.

9. The distinction found its way into the Act as a result of a 1990 amendment expanding the scope of judicial review to include challenges to framework actions taken by the Secretary and not simply challenges to regulations (as was the case prior to the amendment). The public comment requirements of section 1854(b)(1)(A) were inserted by a 1996 amendment to the Act.

was not triggered by the Secretary's action in implementing Framework 14.[10]

 Plaintiffs' substantive argument is that Framework 14 is flawed because the NMFS's refusal to order the closing of additional areas to fishing fails to "minimize to the extent practicable adverse effects on ... habitat," as required by section 303(a)(7) of the Magnuson–Stevens Act, 16 U.S.C. § 1853(a)(7), and fails to minimize bycatch as required by National Standard 9, 16 U.S.C. § 1851(a)(9).[11] The key word, of course, is "practicable." The record amply demonstrates that habitat and bycatch were considered in formulating Framework 14. As defendants point out, Framework 14 continues the prohibition on scallop fishing in Georges Bank Closed Areas I and II and the Nantucket Lightship Closed Area, an area of some 5000 square nautical miles. Framework 14 also maintains restrictions on days at sea, catch and mesh sizes, and seasonal access to sensitive areas. Plaintiffs' criticism of Framework 14 is ultimately one of degree, and not kind. That is to say, plaintiffs fault the NMFS for failing to give habitat protection and the reduction of bycatch the full emphasis that plaintiffs believe they deserve, not that the NMFS failed to respond to the statutory directives to the extent that it deemed practicable under the circumstances in which Framework 14 was adopted.

While the court, if it were writing on a blank slate, might adopt at least some of the alternative measures that plaintiffs recommend, it is constrained by law from substituting its judgment for that of the NMFS. *See Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir.1997) ("[P]olicy choices are for the agency, not the court to make"). Because the court cannot say that the adoption of Framework 14 lies outside "the bounds of reasoned decision making," it cannot characterize the Secretary's action as arbitrary or capricious. *M/V Cape Ann v. United States*, 199 F.3d 61, 63–64 (1st Cir.1999). Moreover, contrary to plaintiffs' assertions, there is no persuasive evidence in the record suggesting that the NMFS failed to comply with the requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4370d, either with regard to the integration of the Supplemental Environmental Impact Statement into the decision making process or in its consideration of plaintiffs' suggested alternatives.

### ORDER

For the foregoing reasons, plaintiffs' motion for summary judgment is *DENIED*. Defendants' cross-motion for summary judgment is *ALLOWED*.

SO ORDERED.

---

10. Having found no violation of the public notice and comment provisions of section 1854(b)(1)(A), I also conclude that the adoption of Framework 14 did not violate the notice and comment provisions of the Administrative Procedure Act (APA), 5 U.S.C. § 553(a)-(c). I agree with defendants that the NMFS's compliance with the abbreviated rulemaking procedure set out in 50 C.F.R. § 648 constituted "good cause" within the

meaning of 5 U.S.C. § 553(b)(B), for dispensing with a further period for public notice and comment.

11. Defendants also argue, accurately I believe, that § 1853(a)(7) applies only to the formulation of a Fishery Management Plan and not to framework adjustments to a plan already in place.