**PACIFIC MARINE CONSERVATION COUNCIL, INC., et al., Plaintiffs,**

**v.**

**Donald EVANS, et al., Defendants.**

No. C 01–2506 JL.

United States District Court, N.D. California.

April 12, 2002.

Eric A. Bilsky, Washington, DC, Andrew P. Caputo, San Francisco, CA, Monica B. Goldberg, Washington, DC, Sylvia F. Liu, Washington, DC, for plaintiffs.

Mauricia M.M. Baca, United States Dept. of Justice, Environmental & Natural Resources Division, Washington, DC, Richard P. Laverdure, U.S. Attorney's Office Civil Division, San Francisco, CA, Catherine R. Lewers, United States Department of Justice, Washington, DC, Ruth Ann Storey, Washington, DC, for defendants.

## ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

LARSON, United States Magistrate Judge.

### INTRODUCTION

Both sides in this action filed Cross–Motions for Summary Judgment [Document Number 17 and 21] and a hearing was conducted on February 27, 2002. Andrew Caputo of the Natural Resources Defense Council, Inc. appeared for Plaintiffs. Mauricia Baca of the U.S. Department of Justice appeared for Defendants. Having considered the moving and opposing papers and arguments of the parties, this court hereby GRANTS Plaintiff's Motion for Summary Judgment, DENIES Defendant's Cross–Motion, and REMANDS Amendment 13 to National Marine Fisheries Service ("NMFS") for reconsideration in light of the legal requirements mandated by the Magnuson–Stevens Fishery Conservation and Management Act ("MSA").

### FACTUAL BACKGROUND

Plaintiffs Pacific Marine Conservation Council, Natural Resources Defense Council, and Ocean Conservancy (collectively "Plaintiffs") move for summary judgment on the grounds that the National Marine Fisheries Service ("NMFS") violated the Magnuson–Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. § 1801 *et seq.*, by approving Amendment 13 to the Pacific Coast Groundfish Fishery Management Plan ("FMP"). Plaintiffs allege that Amendment 13 does not comply with MSA's requirement to regulate bycatch.[1] Plaintiffs request that this court declare that NMFS, in enacting Amend-

---

1. Commercial fishing boats regularly discard the fish they catch that are either "untargeted" or would exceed their quota. These un- wanted fish are called bycatch. See 142 Cong. Rec. S10810 (daily ed. Sept. 18, 1996).

ment 13, violated the MSA, the National Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA"). Plaintiffs also move the court to remand Amendment 13 to NMFS for reconsideration in light of the legal requirements mandated by the acts. Defendants Donald Evans, United States Secretary of Commerce, NMFS, and the National Oceanic and Atmospheric Administration ("NOAA") (collectively "Defendants") filed their cross-motion for summary judgment and request that Plaintiffs' motion for summary judgment be denied. They ask the court to find that Amendment 13 establishes both adequate methodology and adequate conservation management measures that address bycatch to the extent practicable.

The MSA governs the management of federal fishing waters off the coast of the United States. The Commerce Department directs the NOAA, which in turn delegates practical management to the NMFS. NMFS oversees the operations of the eight regional fishery management councils, including the Pacific Fishery Management Council ("Pacific Council"). The Pacific Council develops annual harvest recommendations for the species of fish within its fishery. These recommendations are then subject to revision by the NMFS and formal approval by the Secretary of Commerce.

The MSA was amended in 1996 by the Sustainable Fisheries Act ("SFA") to provide more stringent protections for overfished species such as bocaccio and lingcod. *Natural Resources Defense Council, Inc. v. Evans ("NRDC I"),* 168 F.Supp.2d 1149, 1152 (N.D.Cal.2001). NMFS is responsible under the MSA for ensuring the protection and repopulation of these species through the implementation of rebuilding plans and its annual fishing specifications and limits. *Id.* SFA requires that all fishery management plans aim to rebuild de-

pleted fish populations within a period "as short as possible," but "not to exceed ten years." 16 U.S.C. § 1854(e)(4)(A). The SFA imposes an October 11, 1998, deadline on all regional councils to develop the necessary rules and regulations to comply with the statute. Sustainable Fisheries Act 108(b), Pub.L. No 104–297, 110 Stat. 3359, 3575 (1996). Under ordinary review and approval procedures, Defendants would have been bound to approve all such measures no later than February 1999. 16 U.S.C. § 1854(a); *Conservation Law Found. v. Evans,* —— F.Supp.2d ——, ——, No. 00–1134(GK), slip op. at 6, 2001 WL 1873236 (D.D.C. Dec 28, 2001). Furthermore, the SFA imposes a statutory duty on the Defendants to ensure that the regional councils implemented the provisions of SFA. 16 U.S.C. § 1854(c)(1); *see also, Conservation Law Found.,* —— F.Supp.2d at ——, No. 00–1134, slip op. at 6.

In enacting the SFA, Congress sought to address the issue of bycatch in America's fisheries by adding important new bycatch requirements.

First, Congress added to the MSA a requirement that fishery managers assess the amount and type of bycatch occurring in each fishery. Congress required each fishery management plan to "establish a standardized reporting methodology to assess the amount and type of bycatch occurring in" each fishery management. Sustainable Fisheries Act 108(a)(7), 110 Stat. at 3575 (codified at 16 U.S.C. § 1853(a)(11)).

Second, Congress required fishery managers to take affirmative steps to minimize bycatch and bycatch mortality. Specifically, section 108(a)(7) of the SFA mandates that any fishery management plan which is prepared by any Council, or by the Secretary, with respect to any fishery, shall:

[I]nclude conservation and management measures that, *to the extent practicable* and in the following priority(A) minimize bycatch; and (B) minimize the mortality of bycatch which cannot be avoided.

16 U.S.C. § 1853(a)(11) (emphasis added); *see also* Sustainable Fisheries Act 106(b), 110 Stat. at 3570 (codified at 16 U.S.C. § 1851(a)(9)) (same requirement). Congress further mandated quick action by fishery managers to implement these and other SFA requirements by requiring fishery management councils to submit to NMFS proposed FMP amendments to NMFS. These amendments were intended to bring each existing FMP into compliance with new statutory requirements no later than two years after enactment of the SFA, or by October 11, 1998. Sustainable Fisheries Act § 108(b), 110 Stat. at 3575.

In October 1998 the Pacific Council submitted to NMFS proposed Amendment 11 to the Pacific Coast Groundfish FMP. This was an effort to bring the FMP into compliance with the new requirements of SFA. In 1999, NMFS approved most of Amendment 11 but disapproved the amendment's bycatch provisions. NMFS concluded that Amendment 11 was not responsive to the bycatch requirements of the Magnuson–Stevens Act because it contained no specific measures to collect bycatch information. NMFS concluded that a bycatch amendment would also have to include "an analysis of all practicable alternatives to the current year-round trip limit management system that could be expected to result in a reduction of bycatch rates."

In an effort to respond to NMFS' disapproval of the bycatch provisions of Amendment 11, the Pacific Council subsequently prepared Amendment 13 to the Pacific Groundfish FMP and submitted the proposed amendment to the NMFS in 2000. The purpose of Amendment 13 is to bring the FMP into compliance with the bycatch-related requirements of the MSA. Unfortunately, as discussed below, Amendment 13 falls short of what is required by the MSA.

To comply with MSA's requirement that each plan establish a standardized reporting methodology to assess the amount and type of bycatch, Amendment 13 *permits* but does not *require* an observer program.[2] Amendment 13 provides: "The Regional Administrator *may* implement an observer program through a Council-approved federal regulatory framework." 3 AR B. 14, Appendix A, at A–6 (emphasis added). Amendment 13 does not make the observer program mandatory despite the NMFS' own conclusion that an at-sea observer program is essential for adequately assessing bycatch in the Pacific groundfish fishery. 16 AR O.31 at 2 (NMFS concluded that "critical information on the portion of the catch that is discarded at sea is available only through the placement of onboard observers.")

Similarly, to attempt to comply with MSA's requirement to minimize both bycatch and bycatch mortality, Amendment 13 *lists* but does not *require* certain types of bycatch reduction techniques for the non-whiting groundfish fishery. The sentence in Amendment 13 that introduces this list of potential bycatch reduction techniques reads:

> These [bycatch reduction measures] may include but are not limited to: Full retention or increased utilization programs; setting shorter-than-year-round

---

2. An observer program documents bycatch by placing trained individuals in fishing boats for the duration of a fishing trip. While at sea, the observer records the numbers and species of fish that are discarded overboard, giving fishery managers hard and reliable data on the amount and type of bycatch that is occurring in the fishery. (Pls.'s Mot. for Summ. J. at 12).

fishing season in combination with higher cumulative landing limits; allowing permit stacking in the limited entry fleet; gear modification requirements; catch allocation to, or gear flexibility for, gear types with lower bycatch rates; re-examining/improving species-to-species landings limit ratios; and time/area closures.

3 AR B.14, Appendix A, at A–5. Amendment 13 did not make these techniques mandatory ("may include"), despite MSA's unambiguous intent to minimize bycatch and bycatch mortality to the extent practicable.

## STANDARD OF REVIEW

■■■ The MSA confines the scope of judicial review of agency regulations and actions to that provided in 5 U.S.C. § 706(2)(A),(B), (C), or (D) of the APA. 16 U.S.C. § 1855(f)(1)(B); *NRDC I*, 168 F.Supp.2d at 1154. Section 706 of the APA requires reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency decision may be invalidated if it fails to consider important aspects of a problem, uses criteria Congress did not intend, or is not explained well enough for a reviewing court to identify the agency's response to major policy issues raised in preliminary proceedings. *Alvarado Community Hosp. v. Shalala*, 155 F.3d 1115, 1122 (9th Cir.1998). Furthermore, an agency may not rely on mere conclusory statements to explain its decision. *See, e.g., Chemical Mfrs. Ass'n. v. E.P.A.*, 28 F.3d 1259, 1266 (D.C.Cir.1994) (unsupported and conclusory statement regarding scientific model "added nothing to the agency's defense of its thesis except perhaps the implication that it was committed to its position regardless of any facts to the contrary.")

Judicial review of agency decision-making is circumscribed by statutes such as the APA, the MSA, and NEPA. *NRDC I*, 168 F.Supp.2d at 1160. The role of the judiciary in this regard is not to substitute its own policy considerations for those of an agency. *Abramowitz v. U.S. E.P.A.*, 832 F.2d 1071, 1075 (9th Cir.1987); *see also, National Audubon Soc. v. U.S. Forest Service*, 46 F.3d 1437, 1447 (9th Cir. 1993). Rather, the role of the courts is to ensure that agencies governed by the executive follow express statutory mandates enacted by Congress.

## LEGAL ANALYSIS

While the standard of review of agency action is deferential, courts "do not hear cases merely to rubber stamp agency actions." *Natural Resources Defense Council, Inc. v. Daley*, 209 F.3d 747, 755 (D.C.Cir.2000). Deferring to an agency's exercise of its discretion, however, is not tantamount to abdicating the judiciary's responsibility under the Administrative Procedure Act to set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *A.L. Pharma, Inc. v. Shalala* 62 F.3d 1484, 1491 (C.A.D.C.1995)

■■ Defendants argue that "it is especially appropriate for the Court to defer to the expertise and experience of those individuals and entities-the Secretary, the Councils, and their advisors-whom the Act charges with making difficult policy judgments and choosing appropriate conservation and management measures based on their evaluations of the relevant quantitative and qualitative factors." (Defs.' Cross–Mot. for Summ. J. at 11). However, as Plaintiffs correctly point out, an agency decision or policy is due no deference where it has violated a statute's clear requirement or where the agency has failed to engage in reasoned decision-mak-

ing. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See also, Brower v. Evans,* 257 F.3d 1058, 1065 (9th Cir.2001) (courts "must reject" agency statutory constructions that "frustrate the policy that Congress sought to implement").

Plaintiffs challenge Amendment 13 on three grounds. First, they allege that the NMFS failed to adopt an adequate bycatch methodology. Next, they allege that the NMFS failed to adequately consider the adoption of bycatch measures. Finally, plaintiffs allege that the Service failed to satisfy the requirements set forth under NEPA.

## Adequate Bycatch Assessment Methodology

First, Plaintiffs challenge Amendment 13 for failing to adopt an adequate bycatch assessment methodology in violation of MSA's requirement that each FMP "establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery." 16 U.S.C. § 1853(a)(11). Plaintiff directs this court's attention to NMFS's admission that it lacks adequate data on the amount and type of bycatch in the Pacific ground fishery; that this absence of bycatch data seriously harms its ability to manage the Pacific groundfish fishery and to protect overfished groundfish species; and that an at-sea observer program is essential for adequately assessing bycatch in the Pacific groundfish fishery. While the administrative record makes it clear that an adequate groundfish observer program is essential to account for bycatch in the Pacific, NMFS has yet to implement such an observer program.

Amendment 13 discusses the possible use of observers to assess bycatch at some point in the future. However, it contains no requirement to adopt either an observer program or any other bycatch assessment methodology. As NMFS admits in its Federal Register notice announcing its approval of Amendment 13, the rule "itself does not require implementation of an observer program." 66 Fed.Reg. at 29,729, 29,730 (June 1, 2001).

Defendants argue that Amendment 13 provides for an at-sea observer program and that implementation of this program is underway. (Defs.' Cross–Mot. for Summ. J. at 14). NMFS contends that its observer program provides adequate bycatch assessment as required by MSA. This court finds the program legally insufficient to meet NMFS's bycatch assessment duties under 16 U.S.C. section 1853(a)(11), because it is not mandated by Amendment 13. That section of MSA requires that bycatch assessment methods be established in the fishery management plan itself. Because the observer program is optional under Amendment 13, NMFS in theory could decide not to implement an observer program for the ground fishery, and nothing in Amendment 13 would prohibit the agency from making that decision.

Furthermore, NMFS admits that its observer program cannot provide the data necessary to assess the amount and type of bycatch occurring in the fishery. NMFS calls the current observer program "a limited observer program," and the agency admits that at the current level of funding, the observer program will not be able to provide sufficiently accurate new discard estimates for each area/time/gear strata. *See* 66 Fed.Reg. at 29,731 (only "a limited program is practicable at current funding levels"); (Defs.' Cross–Mot. for Summ. J. at 16) ("current funding levels

cannot support coverage for each area, time, and gear strata").

## CONCLUSION RE AMENDMENT 13 OBSERVER PROGRAM

MSA requires that a fishery management plan establish a bycatch assessment methodology sufficient to assess the amount and type of bycatch occurring in the fishery. 16 U.S.C. § 1853(a)(11). Because Amendment 13 fails to establish a mandatory and adequate observer program—a program that the NMFS itself concedes is critical—this court finds that Amendment 13 is "not in accordance with" the MSA. Accordingly, this court grants Plaintiffs motion for summary judgment on this claim and remands Amendment 13 to NMFS for further consideration and action. 5 U.S.C. § 706(2)(A).

### Amendment 13 Does Not Fulfill the Duty of NMFS to Minimize Bycatch and Bycatch Mortality.

The MSA requires that fishery management plans include conservation and management measures to (a) minimize bycatch and (b) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch, to the extent practicable. 16 U.S.C. § 1851(a)(9), 1853(a)(11); see also 63 Fed.Reg. at 24,244 ("bycatch must be avoided as much as practicable, and bycatch mortality must be reduced until further reductions are not practicable."). By Congressional mandate, fishery managers must bring each existing FMP into compliance by October 11, 1998. Sustainable Fisheries Act § 108(b), Pub.L. No 104–297, 110 Stat. 3359, 3575.

Plaintiffs allege that Amendment 13 fails to minimize bycatch and mortality arising from bycatch, and that, in consequence, NMFS is in violation of the MSA. Amendment 13 fails to adopt any bycatch reduction measures with one limited exception. See 66 Fed.Reg. at 29,733. Amendment 13 contains only a voluntary increased-utilization program for at-sea whiting processors. NMFS did not adopt any bycatch reduction requirement for the non-whiting groundfish fishery. (Pls.' Opp. and Reply on Cross–Mot. for Summ. J. at 9). Rather, Amendment 13 lists a series of potential bycatch reduction measures that NMFS and the Council might consider for adoption at some undetermined point in the future. See 3 AR B. 14 at 23 ("the list of management measures that *could* be implemented *reasonably soon might* include . . ."); (emphasis added). ( *See also* Defs.' Cross–Mot. for Summ. J. at 18) ("Under Amendment 13, practicable management measures that *could* be implemented reasonably *soon* are . . .") (emphasis added); *Id.* at 19 ("Under Amendment 13 and its implementing regulations, the list of management routines that *can be adopted* was expanded to include . . .") (emphasis added). This court finds that by using this discretionary language, ("may include"), Amendment 13 fails to implement the mandate of MSA to reduce bycatch and bycatch mortality.

This court finds that Defendants' adoption of Amendment 13 does not comply with the MSA. MSA requires timely action on bycatch reduction and further requires that all practicable measures be included in the fishery management plan. 16 U.S.C. § 1853(a)(11). Amendment 13 also ignores the fact that overfished Pacific groundfish species need protection from excessive bycatch now, not at some undetermined time in the future. By establishing a two-year deadline for amending FMP to meet the bycatch reduction requirements of 16 U.S.C. section 1853(a)(11), Congress demanded timely action to reduce bycatch. See Sustainable Fisheries Act § 108(b), Pub.L. No 104–297, 110 Stat. 3359, 3575 (establishing two-year deadline). For the foregoing reasons, Amendment 13 falls short of MSA's requirement that FMP's be amended to include conser-

vation and management measures that minimize bycatch to the extent practicable.

Plaintiffs next allege that Amendment 13 violates the legal requirements for reasoned agency decision-making in its dismissal of four viable bycatch reduction measures. (Pls. Mot. for Summ. J. at 17). Specifically, Plaintiffs allege that Defendants dismiss without justification: 1) **reduction of the size of the fishing fleet**; and 2) **establishment of marine reserves** as potential bycatch reduction measures. Plaintiffs claim that the dismissal of these potential measures were based not on their merits, but on Defendants' belief that these are "currently impracticable because implementation would require Council discussion and exploration beyond the scope of this draft amendment." 3 AR B.14 at 30, 3 AR B.14 at 31.

In response, Defendants argue that Amendment 13 did not dismiss the aforementioned measures that might reduce bycatch. Rather, these measures "were discussed, considered, and reasonably determined to be impracticable for immediate implementation through Amendment 13." (Defs.' Cross–Mot. for Summ. J. at 21). Defendants also argue that NMFS has "rationally concluded that implementing a major new regulatory program such as fleet reduction or marine protected areas-both of which are highly complex and controversial-was impractical in the context of Amendment 13." (Defs.' Mem. In Further Supp. of Cross–Mot. and In Reply to Pls.' Opp. at 7). To the contrary, it is evident in the administrative record that NMFS specifically rejected both measures because their implementation would require Council discussion and exploration beyond the scope of Amendment 13. 3 AR B.14 at 30, 3 AR B.14 at 31–32.

■ NMFS rejected both fishing capacity reduction and marine reserves as bycatch reduction measures because it arbitrarily deemed them beyond the scope of Amendment 13. By failing to evaluate these measures on their substantive merits, NMFS violated the requirement that agency decisions be "founded on reasoned evaluation of the relevant factors." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Because the record demonstrates that NMFS' decision making was unreasoned here, Amendment 13 should be rejected and remanded to NMFS. *See Hall v. U.S. E.P.A.,* 263 F.3d 926, 940 (9th Cir.2001). ("If the decision of the agency is not sustainable on the administrative record made, then the decision must be vacated and the matter remanded . . . for further consideration.)" (Citations omitted).

Plaintiffs also challenge NMFS's dismissal of two additional bycatch reduction methods as "impracticable without an observer program." (Pls.' Mot. for Summ. J. at 19–21).

The first of these potential measures is the use of **incentives for vessels with lower bycatch rates**, such as allowing higher landing limits (and thus greater fishing profits) for fishing vessels that fish selectively and thus have relatively low discard rates. 3 AR B.14 at 31.

The second potential measure is the use of **discard caps** to manage the fishery. *Id.*

In response, NMFS argues that these bycatch reduction measures were "reasonably found impracticable without 100 percent observer coverage." (Defs.' Cross–Mot. for Summ. J. at 24). As Plaintiffs correctly point out, this argument begs the question of whether full observer coverage is itself practicable in the groundfish fishery in light of the criteria for practicability set forth at 50 C.F.R. 600.350(d)(3)(i). These criteria are:

Population effects for the bycatch species. Ecological effects due to changes in the bycatch of that species. Changes

in the bycatch of other species of fish and the resulting population and ecosystem effects. Effects on marine mammals and birds. Changes in fishing, processing, disposal, and marketing costs. Changes in fishing practices and behavior of fishermen. Changes in research, administration, and enforcement costs and management effectiveness. Changes in the economic, social, or cultural value of fishing activities and nonconsumptive uses of fishery resources. Changes in the distribution of benefits and costs. Social effects.

50 C.F.R. § 600.350

Defendants argue that "both alternatives are deemed impracticable without a full observer program, since both would required individual vessel monitoring." (Defs.' Cross–Mot. for Summ. J. at 23). According to the Defendants, both alternatives are also discussed in the preamble to the final rule implementing Amendment 13. 66 Fed.Reg. 29729, 29731 (June 1, 2001). With respect to the vessel incentives, NMFS states in the preamble that:

> While a limited observer program is practicable at current funding levels, the type of observer program that would be needed to implement a vessel incentive program is not practicable.

*Id.* With respect to the discard caps, NMFS opines that:

> [A] discard cap program with only limited observer coverage tends to exaggerate the "observer effect" in information about vessels sampled, meaning that the vessels carrying observers have a significant incentive to change their fishing behavior to lower their bycatch rates and keep the entire fishery open. Unobserved vessels do not have this same incentive to reduce discards; thus, there is a strong chance that the whole fleet would reach the discard cap before the observed fleet's expanded data indicated that the cap has been reached.

Stronger observer effect under incentives like discard cap management leads to less scientific accuracy from the observer program.

*Id.*

### ANALYSIS AND CONCLUSION AS TO BYCATCH REDUCTION MEASURES

NMFS did not fully consider the practicability of the more comprehensive observer program necessary to administer vessel incentives or discard caps in light of the factors set forth in 50 C.F.R. 600.350(d)(3)(i). Consequently, NMFS has engaged in unreasoned decision-making in dismissing these two potential bycatch reduction measures. Defendants' failure to minimize bycatch and bycatch mortality is arbitrary, capricious, and contrary to law, and in violation of the MSA, SFA and APA. Accordingly, this court finds that Amendment 13 violates MSA's requirements at 16 U.S.C. §§ 1851(a)(9), 1853(a)(11), and the APA's reasoned agency decision-making. This court also remands Amendment 13 to NMFS for further consideration in light of these requirements. *See Hall v. EPA,* 263 F.3d 926, 940 (9th Cir.2001) ("If the decision of the agency is not sustainable on the administrative record made, then the ... decision must be vacated and the matter remanded ... for further consideration.").

### National Environmental Policy Act ("NEPA") Claim

NMFS adopted an environmental assessment ("EA") of Amendment 13 in an effort to comply with the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. 4321 *et seq.* Plaintiffs request summary judgment on their NEPA claim "since this environmental assessment omits an adequate alternatives analysis and fails to support NMFS' finding of no significant impact." (Pls.' Mot. for Summ. J. at 21).

## EA Analysis of Environmental Impact

NEPA establishes a mandatory environmental-evaluation process to ensure that federal agencies fully consider potential environmental consequences before making decisions. *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (discussing NEPA's twin purposes of informed agency decision-making and informed public participation). There are two types of NEPA documents an agency may prepare to analyze an action's environmental consequences. First, it can first prepare an environmental assessment ("EA"), a more limited document intended to evaluate whether the proposed action may have significant impacts (and hence require an environmental impact statement ("EIS")). *See* 40 C.F.R. §§ 1501.4, 1508.9. Second, an agency can prepare an EIS, containing a detailed analysis of all agency actions that may significantly affect the environment. *Id.* at §§ 1501.4, 1502.1.

Here, NMFS chose to prepare an EA on Amendment 13. When an agency relies on an EA to satisfy its NEPA obligations, rather than an EIS, it must also prepare a finding of no significant impact ("FONSI") to justify its decision not to prepare an EIS on the agency action. NMFS apparently executed a FONSI on Amendment 13 based on the analysis contained in its EA.

To support an EA/FONSI, an agency must produce "a convincing statement of reasons to explain why a project's impacts are insignificant." *National Parks & Conservation Ass'n v. Babbitt,* 241 F.3d 722, 730 (9th Cir.2001), *cert. denied, Holland America Line–Westours, Inc. v. National Parks and Conservation Ass'n,* — U.S. ——, 122 S.Ct. 903, 151 L.Ed.2d 872 (2002). The EA must contain an adequate discussion of the environmental consequences of proposed agency action. *See Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1213–14 (9th Cir.1998) (invalidating EA based on inadequate documentation and cursory treatment of environmental issues).

Plaintiffs claim that the EA for Amendment 13 lack analysis of its environmental impact. NEPA's implementing regulations establish a set of criteria to determine whether an agency's action may have significant environmental impacts. 40 C.F.R. § 1508.27(b). This section requires detailed consideration of **ten criteria** for measuring the severity of impact of an agency action, on a number of areas, whether the effect is permanent or temporary, beneficial or harmful.[3] Of particular

---

3. In evaluating the severity of impact of an agency action, "the following *should* be considered":

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways,

relevance to the case at bar is the statement that "Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment." *Id.* Since the purpose of an EA is to determine whether the agency action may have significant impact (and hence requires preparation of an EIS), these criteria are important in an EA. Plaintiffs allege that Amendment 13 addresses all ten criteria in a single table that occupies the equivalent of only one page in the EA. (Pls.' Mot. for Summ. J. at 23); *see also* 3 AR B.14 at 38–39. Plaintiffs argue that the analysis contained within this table is "conclusory, self-contradictory and unsupported." Pls.' Mot. for Summ. J. at 23.

In response, Defendant argues that Plaintiffs ignore the table's introductory paragraph that "the purpose and need for the proposed action was discussed in section 1.0 of this document" and "the management alternatives and potential environmental and socioeconomic effects of those alternatives are discussed in section 4.0."

■ An agency's determination of the significance of impact of an agency action is a factual one that should not be overturned unless a court, pursuant to the APA standard, finds the decision to be arbitrary and capricious. *Baltimore Gas and Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 97–8, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

Neither the NEPA nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions. *See Scenic Hudson Preservation Conference v. FPC,* 453 F.2d 463, 481 (2nd Cir.1971), *cert. denied,* 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972). However, the court should insure that the agency has taken a "hard look" at the environmental consequences. At the same time, a court cannot interfere with the discretion of the executive as to the choice of action. National Environmental Policy Act of 1969, §§ 2 *et seq.,* 102, 42 U.S.C.A. §§ 4321 *et seq.,* 4332; *see also Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). The role of the court is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious. *See generally Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415–417, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

**CONCLUSION: EA Analysis of Environmental Impact**

■ The court finds that the EA did not contain an adequate discussion of the environmental impact of proposed agency action. In Defendants' one-page table, entitled "NEPA Tests of Significance," Defendants indicate that the "expected beneficial and adverse effects of the proposed actions are discussed above in section 4.0." 3 AR B.14 at 38–39. Section 4.0 only addresses the first of the ten factors that the NEPA requires the agency to consid-

structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.
(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been deter-

mined to be critical under the Endangered Species Act of 1973.
(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.
40 C.F.R. § 1508.27(b) (emphasis added).

er. 3 AR B.14 at 14–37. That section provides an extensive discussion of the consequences of Amendment 13 and various alternatives. *See id.* However, its analysis is insufficient to support the assertions made by Defendants in the NEPA Tests of Significance. For example, in addressing the first factor, in the table the agency claims that "[i]n general, draft Amendment 13 would provide beneficial effects for the environment." 3 AR B.14 at 38. Section 4.0's analysis is insufficient to support this claim, since Amendment 13 neither adopts nor mandates any measures to assess or reduce bycatch for the non-whiting groundfish fishery.

In addressing the fifth factor, the table announces that the "[p]roposed actions are not expected to have significant effects on the environment that are highly uncertain or involved unknown risks." *Id.* This assertion is also not supported by any analysis. Moreover, as Plaintiffs correctly point out, this statement is directly contradicted by the administrative record, which shows that the amount of bycatch occurring in the groundfish fishery is indeed highly uncertain and that the managing fishery, without accurate bycatch data, involves unknown (but potentially grave) risks.

Furthermore, in addressing the seventh factor, Defendants state that "[p]roposed actions are not expected to have cumulatively significant adverse effects on the fishery or other related resource." *Id.* This position is unpersuasive considering the serious decline in the groundfish populations, the contribution of bycatch mortality to that decline, and Amendment 13's failure to take any actions to minimize bycatch or bycatch mortality for the non-whiting groundfish fishery.

Section 4.0 provides a lengthy discussion of the advantages and disadvantages of various alternatives. However, it does not provide sufficient analysis to support its

assertions concerning the other NEPA factors.

Based on the foregoing, this court finds that the Amendment 13 EA falls short of the NEPA's requirements for environmental-impact analysis. Accordingly, this court holds that the NMFS's approval of Amendment 13 violated NEPA and remands the amendment to NMFS for reconsideration and new environmental analysis.

### EA Evaluation of Reasonable Alternatives

Finally, NEPA requires that in the EA an agency must evaluate a reasonable range of alternatives to the agency's proposed action, to allow decision-makers and the public to evaluate different ways of accomplishing an agency goal. 42 U.S.C. § 4332(2)(E) (requiring alternatives analysis); 40 C.F.R. § 1508.9(b)(same). *NRDC I,* 168 F.Supp.2d at 1160 (rejecting Pacific groundfish EIS prepared by NMFS due to inadequate consideration of alternatives). "Consideration of alternatives is critical to the goals of NEPA even where a proposed action does not trigger the EIS process." *Bob Marshall Alliance v. Hodel,* 852 F.2d 1223, 1228–29 (9th Cir.1988).

Plaintiffs claim that Amendment 13 EA violates NEPA by failing to evaluate several reasonable alternatives. (Pls.' Mot. for Summ. J. at 25). Specifically, Plaintiffs allege that Amendment 13 EA failed to evaluate as alternatives the immediate implementation of an adequate at-sea observer program and the immediate enactment of bycatch reduction measures for the non-whiting groundfish.

Defendants respond that "NMFS was under no responsibility to consider every alternative." (Defs.' Mem. In Further Supp. Of Cross–Mot. And In Reply To Pls.' Op. at 11) (citing *Headwaters, Inc. v. Bureau of Land Management,* 914 F.2d

1174, 1181 (9th Cir.1990)). A federal agency's discretion on whether or not to consider an alternative is not without limits. The relevant text in the authority cited by the Defendants, *Headwaters,* reads in pertinent part:

> [The reviewing court reviews] an agency's range of alternatives under a rule of reason standard that requires an agency to set forth only those alternatives necessary to permit a reasoned choice. [T]he touchstone for our inquiry is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation.

914 F.2d at 1180–81 (9th Cir.1990) (internal quotations and citations omitted). This court finds that the agency has not given adequate consideration to reasonable alternatives.

## CONCLUSION: Evaluation of Reasonable Alternatives

It is unreasonable for the NMFS to exclude from the EA the alternative of immediately implementing an adequate at-sea observer program and bycatch reduction measures for the non-whiting groundfish fishery as part of Amendment 13. These alternatives' effect could be reasonably ascertained and their implementation is not remote and speculative. *Id.* Nor are these alternatives infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area. Because the NMFS did not consider these two reasonable alternatives, it has breached its duty under NEPA. 42 U.S.C. § 4332(C)(iii) and (E); 40 C.F.R. § 1502.14. Because the Amendment 13 EA falls significantly short of NEPA's requirements for environmental analysis and alternative analysis, this court finds that NMFS' approval of Amendment 13 violated NEPA and remands Amendment 13 to NMFS for reconsideration and environmental analysis consistent with this opinion.

## CONCLUSION

This court finds as follows:

1. Amendment 13 fails to establish an adequate bycatch assessment methodology.

2. NMFS did not comply with its duty to minimize bycatch and bycatch mortality.

3. NMFS has violated NEPA by not taking a "hard look" at the environmental consequences of Amendment 13.

4. The Environment Assessment NMFS performed in conjunction with Amendment 13 failed to consider a reasonable range of alternatives and environmental consequences, in violation of NEPA.

Plaintiff's motion for summary judgment is hereby GRANTED. Defendant's cross-motion for summary judgment is DENIED. This court finds that NMFS violated the MSA, NEPA, and the APA in approving Amendment 13. Accordingly, this court remands Amendment 13 to NMFS for reconsideration in light of these legal requirements.

IT IS SO ORDERED.