NATURAL RESOURCES DEFENSE
COUNCIL, et al., Plaintiffs,

v.

Donald EVANS, et al., Defendants.

Nos. C 01–0421 JL, C 01–2506 JL.

United States District Court,
N.D. California.

Jan. 17, 2003.

Andrew P. Caputo, Natural Resources Defense Council, San Francisco, CA, Stephen E. Roady, Ocean Law Project, Washington, DC, Monica B. Goldberg, Eric A. Bilsky, OCEANA Inc., Washington, DC, for Plaintiffs.

Catherine R. Lewers, Mauricia M.M. Baca, U.S. Dept. of Justice Environment & Natural Resources Div., Washington, DC, Charles O'Connor, U.S. Attorney's Office, San Francisco, CA, for Defendants.

James P. Walsh, San Francisco, CA, Amicus Curiae.

## ORDER

LARSON, United States Magistrate Judge.

### INTRODUCTION

Plaintiffs' Motion for Order on Remedy came on for hearing on November 20, 2002; Filed at the same time was the Motion of West Coast Seafood Processors' Association and Fishermen's Marketing Association for Leave to file Amicus Brief, which was not opposed by any party. Andrew Caputo appeared for Plaintiffs. Mauricia Bacca appeared for Defendants. There was no appearance for amici. The moving and opposing papers and the arguments of counsel having been considered and good cause appearing, it is hereby ordered that the motion for order on remedy (40–1) is denied, without prejudice.

The Motion for Leave to file Amicus Brief (35–1) is granted. *Amici*, as distinguished from intervenors, may file briefs and may possibly participate in oral argument, but are not entitled to take discovery or participate at trial. (Schwarzer et al. *Federal Civil Procedure Before Trial* at 7:168 and 170).

### JURISDICTION

Defendants object to Plaintiffs' motion on procedural grounds, claiming that it is in effect a motion to amend the judgment, or for reconsideration or relief from judgment, under FRCP Rule 60(b). Defendants claim final judgment was entered in August 2001.

In fact, in the consolidated cases: 01–0421 and 01–0637, summary judgment was granted in August 2001 but no final judgment was entered. In the 01–2506 case, partial judgment was entered April 16, 2002, "as to the equitable relief prayed in this case."

*01–0421, 01–0637 Amendment 12 Remand*

Plaintiffs argue correctly that the court retains jurisdiction after remand to oversee the agency's actions in compliance with the court's directive. Plaintiffs ask this court to set a timetable for compliance with its remand order as it has authority to do. *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir.1981). *See also Arizona Elec. Power Coop. v. United States*, 816 F.2d 1366, 1376 (9th Cir.1987) (establishing a 60–day deadline for agency action on remand). "Generally, a remand order is an interlocutory order which does not divest a court of jurisdiction over a case." *Avery v. Secretary of Health & Human Services*, 762 F.2d 158, 163 (1st Cir.1985); *Papazian v. Bowen*, 856 F.2d 1455, 1456 (9th Cir.1988) (presuming that "any dispute over the agency's determination on remand would have been presented to the district court and possibly to us on appeal.")

An order remanding a matter to an administrative agency is a non-final interlocutory order. *See Chugach Alaska Corp. v. Lujan*, 915 F.2d 454, 456 (9th Cir.1990) ("in general, remand orders are not considered final"); *Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 329–330 (D.C.Cir.1989) (reviewing case law and

concluding "[t]he courts of appeal that have considered the question ... have uniformly held that, as a general rule, a remand order is 'interlocutory' rather than 'final' "); *United States v. Spears,* 859 F.2d 284, 286–287 (3d Cir.1988) ("[A]n order remanding a matter to an administrative agency is no more than an interlocutory step in an adjudicative proceeding...").

The August 2001 order in the consolidated 01–0421 and 01–0637 cases setting aside portions of Amendment 12 and remanding to the agency falls within this rule, and this court can exercise its continuing jurisdiction over these consolidated cases on this basis.

### 01–2506 Amendment 13 Remand

In the 01–2506 case, concerning Amendment 13, the partial judgment does not divest this court of jurisdiction, since the court did not enter a final judgment but ruled only that "judgment be entered for Plaintiffs as to the equitable relief prayed in this case." As stated above, such a remand order is interlocutory, not final, and the court retains jurisdiction.

This court may also modify its partial judgment in order to ensure compliance. A federal court has inherent power to enforce its judgments. *Peacock v. Thomas,* 516 U.S. 349, 356, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996) ("Without jurisdiction to enforce a judgment entered by a federal court, the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution.") The court also has the power to modify its judgments.

■ A district court "always ha[s] the power to modify earlier orders in a pending case." *Kapco Mfg. Co. v. C & O Enterprises, Inc.,* 773 F.2d 151, 154 (7th Cir.1985). Moreover, it is well established that a district court has the inherent power to reconsider interlocutory orders and reopen any part of a case before entry of final judgment. *See Marconi Wireless Tel. Co. v. United States,* 320 U.S. 1, 47–48, 63 S.Ct. 1393, 1414–15, 87 L.Ed. 1731 (1943). This authority does not rest in any particular federal rule, but emanates from the inherent power of the court. *See A Hollow Metal Warehouse v. United States Fidelity & Guar. Co.,* 700 F.Supp. 410, 411–12 (N.D.Ill.1988). Thus it is within a district court's discretion to revisit previously issued orders while the case is still pending before the court.

Rule 60(b)(6), Federal Rules of Civil procedure, provides that a judgment may be altered for "any other reason justifying relief from the operation of the judgment." The rule "provides courts with authority adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice," although "it should only be applied in extraordinary circumstances." *Liljeberg v. Health Services Acquisition Corp.,* 486 U.S. 847, 864, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988). Plaintiffs in the cases at bar contend that these cases present extraordinary circumstances.

The NMFS, this court has ruled, failed to take actions to prevent or reduce bycatch of overfished species, which were mandated by Congress to take place by October 1998. *Pacific Marine Conservation Council v. Evans,* 200 F.Supp.2d 1194, 1198, 1201 (N.D.Cal.2002) (noting passing of statutory deadline). After losing the case on the merits, NMFS now proposes to proceed at its accustomed pace, still not correcting its deficiencies for several more years. For example, its bycatch reduction measures will not be released in draft form until summer 2003 or in final form until summer 2004 (Robinson Decl. at 10). Further measures will not be taken until 2004, and perhaps into 2005 or beyond, given the agency's history.[1]

---

**1.** Plaintiffs claim that some of Defendants' proposals are going in the wrong direction.

Plaintiffs reject Defendants' protests that Plaintiffs delayed seeking this remedy. The parties have been in settlement discussions on remedy issues starting in April and into October. Plaintiffs claimed these sessions were initiated by Defendants and abruptly halted in October.

This court concludes that its order in the consolidated cases was interlocutory in nature and subject to review and continuing enforcement by the court and that the partial judgment was just that, and not a final judgment and that in any event the court has authority to see that its orders are obeyed. Accordingly this court has jurisdiction over both the consolidated cases related to Amendment 12 and the case related to Amendment 13 and the defendants' compliance with the court's remand.

## PREVIOUS ORDERS

This court entered its order of partial summary judgment in the consolidated cases (01–0421 and 01–0637) on August 20, 2001. The court ruled:

NMFS has failed to adhere to the aforementioned provisions of the APA, the MSA, and NEPA, and, accordingly, The court hereby grants the following relief:

● 1. Declaratory judgment that NMFS's revised 2001 specifications for bocaccio rockfish and lingcod fishing limits violates the M.S.A. § and APA by failing to adequately account for discard mortality;

● 1a. An order that NMFS reassess its 2001 specifications using a legally adequate consideration of discard mortality;

● 2. Declaratory judgment that NMFS violated the M.S.A. § and the APA by not providing prior public notice and allowing for comment on the 2001 specifications after their publication by the Secretary;

● 2a. An order that, in accordance with the M.S.A. § and the APA, NMFS provide prior public notice and allow comment on future Pacific groundfish specifications;

● 3. Declaratory judgment that Amendment 12 violates the M.S.A. § by authorizing inadequate rebuilding plans for overfished species;

● 3a. An order setting aside that portion of Amendment 12 that authorizes rebuilding plans that do not accord with the M.S.A. § and remanding it to NMFS for further consideration;

● 4. Declaratory judgment that the Environmental Assessments NMFS performed in conjunction with Amendment 12 and the 2001 bocaccio and lingcod groundfish specifications failed to consider a reasonable range of alternatives and environmental consequences, in violation of NEPA;

● 4a. An order setting aside and remanding the EAs performed in conjunction with Amendment 12 and the 2001 groundfish specifications to NMFS.

The court hereby grants to NMFS the following:

● 3. Declaratory judgment that the issue of Amendment 12's inclusion of a "mixed-stock exception" is not yet ripe for adjudication;

● 3a. An order allowing the "mixed-stock exception" of Amendment 12 to stand, subject to any revisions NMFS imple-

---

For example, in setting the 2002 Pacific groundfish fishery specifications, NMFS increased the allowable fishing harvest for dark-blotched rockfish, one of the overfished species, by nearly 30%, despite having received new information showing the species to be far more overfished than the agency previously believed. By increasing the harvest level this much, NMFS has delayed rebuilding this species by roughly 20 years. *See* Complaint in *NRDC v. NMFS*, C–02–1650 CRB (Ex. 1 to Decl of James P. Walsh in Support of Motion to File Amicus Brief)

ments after conducting an adequate EA in conjunction with 4a *supra;*

Plaintiffs' Motion to Strike Defendants' Answer is denied, as moot. (01–0421 JL and 01–0637 JL, NRDC and *Oceana v. Evans*)

That was August 20, 2001.

In 01–2506, This court entered its order granting partial summary judgment for Plaintiffs and part for Defendants in on April 12, 2002. The court ruled:

This court finds as follows:

1. Amendment 13 fails to establish an adequate bycatch assessment methodology.
2. NMFS did not comply with its duty to minimize bycatch and bycatch mortality.
3. NMFS has violated NEPA by not taking a "hard look" at the environmental consequences of Amendment 13.
4. The Environment Assessment NMFS performed in conjunction with Amendment 13 failed to consider a reasonable range of alternatives and environmental consequences, in violation of NEPA.

Plaintiff's motion for summary judgment is hereby GRANTED. Defendant's cross-motion for summary judgment is DE-NIED. This court finds that NMFS violated the MSA, NEPA, and the APA in approving Amendment 13. Accordingly, this court remands Amendment 13 to NMFS for reconsideration in light of these legal requirements. (01–2506 JL, *Pacific Marine Conservation Council v. Evans*)

That was April 12, 2002.

## POSITION OF THE FISHERMEN AND PROCESSORS

Plaintiffs want the court to light a fire under NMFS. Defendants along with amici, the fishermen and the processors, claim that NMFS has already made significant progress and that if its resources are diverted by this court, it will be slowed down or stalled entirely.

Amici ask the court to consider the human costs of drastic reductions in fishing quotas and not just dry statistics or legal theory.

Amici claim that Plaintiffs' contentions are mooted by the NMFS' subsequent regulations. *Gulf of Maine Fisherman's Alliance v. Daley*, 292 F.3d 84 (1st Cir.2002) (challenge mooted when fishing season ended and no evidence existed as to possibility of repetition of unlawful action).

With respect to NMFS' former lack of notice and comment for the 2001 specification, applicants point out that NMFS issued draft regulations for the 2002 specifications on January 11, 2002 (Ex. 2 to Walsh Declaration) and adopted final specifications on March 7, 2002 (Ex. 3 to Walsh Decl.). Notice and comment were allowed on the specifications. In response to the court's ruling, the Pacific Council changed its decision-making practice and made its recommendations for the 2003 specifications at its September 2002 meeting. These recommendations are also the subject of a draft environmental impact statement, available to the public on the Internet. (Ex. 4 to Moore Decl.) Applicants find this issue also moot. *Natural Resources Defense Council v. U.S. Nuclear Regulatory Commission*, 680 F.2d 810, 813–815 (D.C.Cir.1982) (procedural challenge moot when notice and comment provided for repromulgated regulations.)

With respect to remand of the rebuilding plans to NMFS, applicants contend that the plans continue to be developed in accordance with the procedures of the Magnuson–Stevens Act and the National Environmental Policy Act. 67 Fed.Reg. 10491. While the completed plans are not yet final, NMFS has made several changes to the 2002 measures adopted on March 7

to further reduce fishing opportunities, protect overfished stocks, and prevent bycatch. (Exs. 4, 5, 6 and 7 to Walsh Decl.) The purpose of the 2002 inseason adjustments to trip limits was based on the need to keep the incidental take low for overfished species, with limits on health stock harvests modified by the new bycatch estimating method adopted for 2002. (Ex. 4 to Moore Decl.—draft EIS for 2003 specifications 1–3). Amici believe that forcing completion of the rebuilding plans by January 1, 2003 as requested by Plaintiffs is unnecessary and inconsistent with the depth of consideration mandated by this court and currently underway at NMFS. Any challenge to the rebuilding plan is therefore not yet ripe for review.

The new NMFS environmental assessment and regulatory impact review for bocaccio and lingcod have been prepared, but are not part of the administrative record before this court. Furthermore, they have been challenged by Plaintiffs in a new lawsuit pending before Judge Breyer. (Ex. 1 to Walsh Decl.) Amici contend the adequacy of this assessment and the regulations should be subject to new briefing, for example, in cross-motions for summary judgment. 168 F.Supp.2d at 1160 (relief item 4).

Amici contend that this court's previous ruling in the case challenging Amendment 13, the "2506 case," reported at 200 F.Supp.2d 1194, only addressed certain violations relating Amendment 13 to Pacific Groundfish Fishery management. However, this court's decision in that case did not address any other aspects of the fishery management plan as it relates to measures for reducing bycatch, including those adopted after the action challenged in that case. This court remanded Amendment 13 to the NMFS for reconsideration in light of the court's ruling. 200 F.Supp.2d at 1207. Plaintiffs have again challenged Amendment 13 in the case before Judge

Breyer. Complaint ¶ 52–64 (Fourth and Fifth Claims for Relief; Ex. 1 to Walsh Decl.) Amici contend that NMFS has taken new actions to minimize incidental bycatch, for instance reduction of trip limits and the creation of a no trawling zone. (Exs. 4, 5, 6 and 7 to Walsh Decl.) Applicants question the wisdom of this court's re-opening this issue at the same time it is being considered as affected by the newer regulations in a new case before a different judge.

Finally, amici contend that NMFS is substantially complying with the deadlines for preparing rebuilding plans found in 16 U.S.C. § 1854(e) by working through the Council process. Furthermore, applicants urge the court to find that NMFS' actions taken so far this year to manage the Pacific Groundfish Fishery comply with the Magnuson–Stevens Act, for example by banning trawling in a huge area of the Pacific Ocean, since commercial fishing trawlers capture about 75 % of the Pacific groundfish harvest by weight. This measure and the actions to reduce trip limits particularly benefit the darkblotched rockfish (67 Fed.Reg. 57973–57).

Amici urge the court not to interfere, especially since the incremental actions of the NMFS over this year have been consistent with the rebuilding plan now under consideration. 67 Fed.Reg. At 10492.

Amici join with Defendants in asking this court to deny Plaintiff's Motion for Order on Remedy.

## DEFENDANTS' POSITION

The former Amendments 12 and 13, remanded by this court, will be replaced by a proposed Amendment 16. (Robinson Declaration, Ex. 1 to Defendants' Opposition). NMFS and Council staff are now in the process of completing a proposed rule and accompanying analysis for 2003, with a target publication date of December 13,

2002. Defendants claim that all of the 2002 fishery management measures necessary to implement existing rebuilding strategies for overfished species have been adopted by the Council and implemented by NMFS as regulations. (Robinson Decl.) The Council has also recommended regulations that will continue to implement the rebuilding strategies in 2003. NMFS will publish the recommendations for 2003 in the Federal Register as proposed regulations in 2002, with final regulations effective on March 1, 2003. This is two months after Plaintiffs' deadline, and unclear as to which species are included.

Defendants use NEPA requirements as justification for the lengthy timeline, including the need to prepare a Draft Environmental Impact Statement ("DEIS"). The major objective of the Council's recent recommendations for 2003 groundfish fisheries is to eliminate directed catch and minimize and reduce bycatch of overfished species (specifically bocaccio, canary, darkblotched and yelloweye rockfish, and cowcod), so the total mortality of overfished species does not exceed the annual catch level optimum yield ("OY") required to meet the objectives of the draft rebuilding plans under consideration by the Council (*Id.*)

## AGENCY ACTIONS—DEFENDANTS' VERSION

William L. Robinson, Assistant Regional Administrator for Sustainable Fisheries, gives a point-by-point account of how his office is complying with this court's previous orders:

1. *Rebuilding plans must be in the form of fishery management plan amendments, or proposed regulations. 168 F.Supp.2d at 1158.*

NMFS and the Council are completing development of Amendment 16 to the Pacific Groundfish FMP. This includes Pacific Ocean perch ("POP"), lingcod, cowcod,

widow rockfish and darkblotched rockfish. The Council and the public reviewed initial drafts of Amendment 16 at the April 2002 Council meeting, and again at the June 2002 meeting. The Council made final recommendations for the 2003 actions at its September 2002 meeting. NMFS and Council staff are completing a proposed rule and accompanying analysis for 2003, with a target publication date of December 13, 2002. The Council will make final revisions between now and April 2003, as well as drafting the accompanying NEPA documents, presenting both for public review at the April 2003 meeting, with final approval scheduled for the June 2003 meeting. If adopted then, Amendment 16 will be approved in fall 2003. Additional FMP amendments for the other overfished species would be prepared over the summer and fall of 2003 for adoption in late 2003 or early 2004.

All the 2002 fishery management measures necessary to implement existing rebuilding strategies for overfished species were adopted by the Council and were implemented by NMFS as regulations. The Council also recommended regulations that will continue to implement the rebuilding strategies in 2003. NMFS will publish the recommendations for 2003 in the Federal Register as proposed regulations in December 2002, with final regulations effective March 1, 2003.

2. *Perform adequate NEPA analysis on bycatch alternatives for bocaccio and lingcod for the 2001 fishery specification. 168 F.Supp.2d at 1160.*

NMFS has responded by making recommendations for 2003 groundfish fisheries to eliminate directed catch and minimize and reduce bycatch of overfished species (primarily bocaccio, canary, darkblotched and yelloweye rockfish, and cowcod), so the total mortality of overfished species does not exceed the annual catch level

(OY) required to meet the objectives of the draft rebuilding plans under consideration by the Council. The Council prepared a Draft Environmental Impact Statement ("DEIS") to analyze the effects of different harvest levels and fishing regimes on the bycatch of overfished species. Defendants characterize the three alternatives as: high OY levels, low OY levels and moderate OY levels. Low levels would be good for the fish but very bad for the fishermen. High levels are very bad for fish and require longer rebuilding periods than previously recommended by the Council (or probably allowed by law). The moderate levels would rebuild the stocks of overfished species in fewer than the maximum number of years allowed by the NOAA National Standard Guidelines, and gives some consideration to the effect on coastal communities and the fishing industry. The NMFS also considered the Allocation Committee's recommendations for moderate OY levels both with and without large depth-based time and area closures. (Conservation Areas).

Allowing for the 45–day comment period for the DEIS filed with the EPA October 18, 2002, the final EIS is expected to be completed by February 28, 2003.

The Council is also preparing a long-term programmatic EIS to evaluate a number of alternatives including additional access limiting measures. The Council appointed a sub-committee to work with NMFS to develop alternatives and the Council is scheduled to make its recommendations to NMFS at the October 28, 2002 meeting in Foster City, California. The Draft programmatic EIS is scheduled to be completed in August 2003. This will evaluate the viability of a wide range of bycatch reduction measures.

3. *Study, develop and describe appropriate rebuilding alternatives when preparing rebuilding amendments. 168 F.Supp.2d at 1160.*

Defendants are considering the alternatives sought by Plaintiffs, such as specific limits and constraints on fishing, including bycatch-related measures in rebuilding plans, and assessing and minimizing the effects on essential fish habitat. Under a settlement agreement in the case of *American Oceans Campaign v. Evans*, C–99–982 GK (D.D.C.), Joint Stipulation and Order entered December 19, 2001, NMFS is required to prepare a new, separate EIS that addresses the essential fish habitat (EFH) requirements of the Pacific Coast Groundfish FMP. Under the schedule contained in the Settlement Agreement, NMFS will complete a DEIS in late summer 2003 and a final EIS and Record of Decision in summer 2004. That EIS will address the effects of fishing for groundfish on EFH and will evaluate alternative management measures to minimize those effects.

4. *Amendment 13 is remanded to NMFS to make the observer program mandatory. 200 F.Supp.2d at 1200–1201.*

Amendment 16 will make the observer program mandatory. Amendment 16 is expected to be adopted for public review in April 2003, with a final version being transmitted to NMFS for review and approval in June 2003. NMFS approval and implementation is expected to be complete in fall 2003. Observers are being placed aboard fishing vessels as described in the Declaration of Dr. M. Elizabeth Clarke, Ex. 2, to defendants' Opposition. Under 50 C.F.R. § 660.360, groundfish vessels must carry observes when requested by NMFS.

5. *Amendment 13 is remanded to NMFS because it fails to include conservation and management measures that minimize bycatch to the extent practicable. In addition, NMFS failed to evaluate two bycatch reduction measures—fishing capacity reduction and marine reserves—on*

*their merits, and also failed to fully consider the practicability of a more comprehensive observer program necessary to administer vessel incentives and discard caps. NMFS also failed to take a "hard look" at the environmental consequences of Amendment 13 under NEPA, and the Amendment 13 EA failed to consider a reasonable range of bycatch reduction alternatives and the environmental consequences.* 200 F.Supp.2d at 1201–1203, 1205–1207.

In response, NMFS either already has taken, or will for the 2003 fishing season, take the following actions:

a. higher landing limits for target species for fishermen using small footrope[2] trawls. These boats work best where the bottom is sandy, and bycatch is less there than where the bottom is rocky.

b. Beginning in the 2003 fishing season, the use of small footrope trawls will be mandatory in all areas open to fishing which are shoreward of the closed conservation areas (roughly 100–250 fathoms in depth coastwide). Large footrope trawls will be prohibited in all nearshore areas, and their use limited to deepwater Continental Slope fisheries (generally deeper than 250 fathoms) where bycatch is minimal.

c. Beginning in 2002, NMFS closed year-round the Cowcod Conservation Area, a large area off Southern California, to prevent bycatch of cowcod in fisheries that target other species. NMFS also prohibited retention of cowcod in all fisheries.

d. Beginning with the 2003 fishing season, NMFS will institute coastwide depth-based closures of large areas of the Continental Shelf off the entire U.S. coast line from Canada to Mexico. These will include the California Rockfish Conservation Area, from Cape Mendocino to the U.S.-Mexican border, generally between depths of 60 fathoms to 150–250 fathoms. Most use of commercial and recreational gear to take groundfish will be excluded. This closure should dramatically reduce the bycatch of bocaccio rockfish and to a lesser extent canary rockfish. From Cape Mendocino north to the Canadian border, there will be another depth-based closure, from roughly 100 fathoms to 250 fathoms. This will significantly reduce the bycatch of darkblotched rockfish, canary rockfish and yelloweye rockfish.

e. In 2002, NMFS implemented a new method of setting landing limits for target species, based on proposals made by the NRDC plaintiffs. Plaintiffs had proposed that management measures be based on the actual ratio in the catch between the target species and the bycatch species. They also proposed that landing limits for the target species not be increased inseason, even if the full harvest guideline for the target species was not taken, in order to further protect bycatch species. Defendants implemented this approach in 2002, and intend to improve upon it in 2003 and beyond, using the new bycatch data from the observer program.

## DEFENDANTS' PROJECTED IMPLEMENTATION DATES

Here is a reprise of when different species were identified as overfished, followed by Defendants' timelines for remedial measures:

Some of the species were identified in March 1999 (bocaccio, lingcod and Pacific ocean perch, "POP"), others on January 2000 (canary rockfish and cowcod), others

---

2. A footrope is "the portion of the boltrope to which the lower edge of a sail is sewn; or a rope suspended a few feet beneath a yard, bowsprit, job boom or spanker boom to give a footing for a person handling sails. (Websters Unabridged Dictionary, 1996)."

in January 2001 (darkblotched rockfish and widow rockfish). None of these species yet has a rebuilding plan. In the meantime, two more species have been identified within the past year, yelloweye

1) Rebuilding in form of fishery management plan

Remaining species—

2) Adequate NEPA analysis on bycatch for bocaccio & lingcod (including darkblotched, canary & yelloweye rockfish & cowcod)

3) Consider appropriate rebuilding alternatives

4) Make observer program mandatory

5) Minimize bycatch

rockfish (January 2002) and Pacific whiting (April 2002).

Here are the court's mandates and Defendants' proposed dates for compliance:

Final regulations March 1, 2003 Plan—Fall 2003—4½ **yrs after identification**

Late 2003, early 2004—3 **to 4 years after identification**

Final EIS February 28, 2003—4 **years after identification**

Draft programmatic EIS August 2003

Settlement agreement in *American Oceans Campaign* case—Draft EIS late summer 2003; Final EIS and Record of Decision—summer 2004

Fall 2003

Various measures beginning 2002 & 2003.

## PLAINTIFFS' POSITION

Plaintiffs want NMSF to comply with 16 U.S.C. § 1854(e)(3). This section requires that rebuilding plans be prepared for overfished species within one year of their being identified as overfished. Some of the species were identified in March 1999 (bocaccio, lingcod and Pacific ocean perch, "POP"), others on January 2000 (canary rockfish and cowcod), others in January 2001 (darkblotched rockfish and widow rockfish). None of these species yet has a rebuilding plan. In the meantime, two more species have been identified within the past year, yelloweye rockfish (January 2002) and Pacific whiting (April 2002).

In fact, section 1854(e)(3) provides several options: a fishery management plan, a plan amendment or proposed regulations, all directed toward ending overfishing or prevention of overfishing. Any of these

proposals shall specify a time period for ending overfishing and rebuilding the fishery, allocating restrictions and benefits as fairly as possible, taking into account the needs of fishing communities. If the Council does not prepare a plan within the one year period, then the Secretary shall prepare either a fishery management plan, a plan amendment or a regulation within nine months.

In total, the Department of Commerce must institute action within twenty-one months of a species being identified as overfished.[3]

Plaintiff claim that the NMFS published a schedule in the Federal Register at the beginning of 2002 under which rebuilding plans for the seven overfished species listed above would be adopted by the Pacific Fishery Management Council in June 2002. 67 Fed.Reg. 1,555, 1,567 (Jan. 11,

**3.** The provisions of the law support a finding that there is no flexibility. The Secretary

must step in and act expeditiously if the Council fails to act within the deadline.

2002). The Council did not approve these rebuilding plans in June 2002, and has not done so to date. NMFS has not stepped in as it is required to do if the Council fails to act.

In fact, it appears that the Council attributes to litigation some role in this delay. In the Draft Environmental Impact Statement, (Ex. 4 to Declaration of Rodney Moore) the Council states:

Although the Groundfish FMP states that all specifications will remain in effect until changed, they are announced annually on or about January 1. These management specifications are developed by the Council, based on a review of available stock status information, over the course of several meetings. Until this year, this occurred at the September meeting, when the Council would adopt a range of alternatives representing preliminary harvest specifications (the Acceptable Biological Catch [ABC] and Optimum Yield [OY] for species or species groups) and management measures intended to limit catches to those targets. At its November meeting, the Council would then choose a preferred alternative, representing final harvest specifications and management measures. However, the court ruling in *Natural Resources Defense Council v. Evans,* 168 F.Supp.2d 1149 (N.D.Cal. 2001) found that NMFS was not allowing sufficient time for public notice and comment on the regulations before they were implemented at the beginning of the new year. Now, in order to allow enough time for the required comment period and still implement management measures early in the year, the Council must make its final decision at its September meeting, with the development of alternatives pushed back to the June meeting. (Footnote omitted)

Plaintiffs ask this court to set a timetable for compliance with its remand order

as it has authority to do. *Zambrana v. Califano,* 651 F.2d 842, 844 (2d Cir.1981). *See also Arizona Elec. Power Coop. v. United States,* 816 F.2d 1366, 1376 (9th Cir.1987) (establishing a 60–day deadline for agency action on remand). "Generally, a remand order is an interlocutory order which does not divest a court of jurisdiction over a case." *Avery v. Secretary of Health & Human Services,* 762 F.2d 158, 163 (1st Cir.1985); *Papazian v. Bowen,* 856 F.2d 1455, 1456 (9th Cir.1988) (presuming that "any dispute over the agency's determination on remand would have been presented to the district court and possibly to us on appeal.")

Plaintiffs ask this court to order NMFS to comply with its orders and complete a rebuilding plan for each of the seven overfished species by January 2003.

### PLAINTIFFS' SPECIFIC OBJECTIONS TO TIMELINE

Plaintiffs contend that NMFS has failed completely to remedy the legal violations in Amendment 12 and Amendment 13. The Congressionally mandated deadlines have passed, for some species, years ago. In the case of bocaccio, lingcod, and Pacific ocean perch, the rebuilding plans are now already two and one-half years late. Fourteen months after this court's ruling, the agency has failed to approve a single rebuilding plan for any of these species.

**Amendment 12—Rebuilding Plans—** Under the NMFS proposed schedule a rebuilding plan for bocaccio would not be approved until roughly *five years* after bocaccio was designated an overfished species in March 1999. The Magnuson–Stevens Act requires that a rebuilding plan be prepared within *one year* after a species is designated as overfished. Nine months after that, the Secretary is supposed to step in and prepare the plan. 16 U.S.C.

§ 1854(e)(3). NMFS protests that it is working with the Council (Pacific Fisheries Management Council). The law explicitly provides that if the Council can't prepare the plan within one year, that the agency steps in and gets the job done.

**Amendment 13—Bycatch Assessment Methodology**—In its August 2002 summary judgment order the court found that Amendment 13 violated the Magnuson–Stevens Act requirements to reduce by-catch and include all practicable bycatch reduction measures in the FMP. *Pacific Marine Conservation Council v. Evans,* 200 F.Supp.2d at 1201–1203. The court recognized the two-year Congressional deadline for amending the FMP to reduce bycatch. *Id.* at 1201. This deadline expired four years ago, in 1998. *See Id.* at 1198. NMFS proposed timetable for by-catch reduction is open-ended and centers on an environmental analysis ("EA") that will not be released in draft form until summer 2003, or in final form until summer 2004. (Robinson Decl at 10) This despite the court's ruling that "overfished Pacific groundfish species need protection now, not at some undetermined time in the future." *Pacific Marine Conservation Council v. Evans,* 200 F.Supp.2d at 1201.

**PLAINTIFFS' PROPOSED TIMELINE**

Plaintiffs reject Defendants' plea that the court consider the so-called *TRAC*[4] factors balancing test to determine whether NMFS' delays and timetable are unreasonable. The Ninth Circuit has explicitly

held the TRAC factors to be inapplicable where Congress has set a specific deadline for agency action. *Biodiversity Legal Foundation v. Badgley,* 309 F.3d 1166, 1177 n. 11 (9th Cir.2002). Where "Congress has specifically provided a deadline for performance by the [agency], ... no balancing of factors is required or permitted." *Id. See also Center for Biological Diversity v. Abraham,* 218 F.Supp.2d 1143, 1160 (N.D.Cal.2002) (Ninth Circuit held application of *TRAC* factors "inappropriate where Congress ha[s] set specific mandatory deadlines for agency action."). Since the Magnuson–Stevens Act sets specific, mandatory deadlines for agency action on rebuilding plans and bycatch, NMFS's lengthy timing arguments based on the *TRAC* factors are invalid under this binding precedent.

## CONCLUSION

Judicial review of an agency's actions to implement the Magnuson–Stevens Act are allowable "to the extent authorized by, and in accordance with" the Administrative Procedures Act. 16 U.S.C. § 1855(f)(1). The Secretary's decision is not subject to de novo review. *Washington Crab Producers, Inc. v. Mosbacher,* 924 F.2d 1438, 1441 (9th Cir.1990). De Novo is the process of hearing a matter "as if it had not been heard before and as if no decision had been previously rendered." Black's Law Dictionary 435 (6th Ed.1990). The court hears the matter as a court of original jurisdiction rather than

4. (after *Telecommunications Research & Action Ctr. v. FCC,* 750 F.2d 70, 80 (D.C.Cir. 1984)) These factors are: (1) the time agencies take to make decisions must be governed by a "rule of reason," (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason, (3) delays that might be reasonable in the sphere of economic regulation are less

tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority (5) the court should also take into account the nature and extent of the interests prejudiced by delay and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

*Id.* at 79–80 (internal citations omitted)

appellate jurisdiction. *Id.* Rather than hearing the matter anew, the court simply reviews the decision for reasonableness. A court will set aside an FMP or regulation only where the record shows that the Secretary's findings with regard to the challenged FMP or regulation were "arbitrary, capricious, or otherwise contrary to law." *Associated Fisheries of Maine v. Daley,* 127 F.3d 104, 109 (1st Cir.1997). See also *Parravano v. Babbitt,* 861 F.Supp. 914, 921 (N.D.Cal.1994) (finding that the Secretary's action may only be invalidated if challenged action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,") quoting 5 U.S.C. § 706(2)(A) (1982), aff'd 70 F.3d 539, 548 (9th Cir.1995), and cert. denied, 518 U.S. 1016, 116 S.Ct. 2546, 135 L.Ed.2d 1066 (1996); *Alaska Factory Trawler Ass'n v. Baldridge,* 831 F.2d 1456, 1460 (9th Cir.1987) (stating that the Secretary's determination that the FMP did not violate the Act's national standards or other applicable law could only be disturbed if such conclusion was arbitrary and capricious or was an abuse of discretion) *J.H. Miles & Co. v. Brown,* 910 F.Supp. 1138, 1146 (E.D.Va.1995) (finding judicial review of agency decisions under Magnuson–Stevens Act to be limited, therefore challenged regulations may be invalidated only if they are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.)

In the case at bar, the agency's failure to comply with Congressionally mandated deadlines, as provided in the Magnuson–Stevens Act, is a violation of law. This court in effect has no discretion, once it has made that factual and legal finding, except to find that defendants have failed to comply with the MSA. The problem then is finding an appropriate remedy.

Most of the cases this court has found on this issue involve an agency's enacting a regulation which violates the intent of Congress. The court then steps in and orders the agency to cease and desist. In the case at bar, Plaintiffs ask the court to apply the standard to an agency's failure to take action in the timeframe mandated by Congress. In this instance, the law is that certain actions must be taken within a certain amount of time after a species has been identified as overfished: the maximum time between the identification of a species and the completion of a rebuilding plan is twenty-one months (one year for the Council to take action plus nine months for the agency if the Council fails to act). Defendants have failed to take the mandated action within the time frame required by law. This court could reasonably find that the agency's action is contrary to law and therefore the Plaintiffs win, but then where are we? It is one thing for a court to enjoin an agency action, then revoke a regulation and order an agency to stop. How does a court force an agency to do its job within the time required by law?

Most of the fish species at issue in this case were identified as overfished in 1999, and the measures which this court ordered taken in August 2001 have yet to be implemented, and it's been three years, going on four. Defendants have been actively engaged in pursuing measures to reach the goals of the M.S.A. § and the regulations and to comply with the orders of this court. The process has just been glacially slow. Setting new deadlines would probably be futile, unless the court were willing to assume an active role, perhaps by appointing a special master at defendants' expense.

Decades will pass before some of the fish species at issue are predicted to recover. Defendants spend a portion of their budget each year to buy fishing boats from

captains who are leaving the fishery and to pay to retrain their crews for other work. This court perceives a need for restraint and patience. In the larger context, the court must balance the survival of the fish and the survival of the fishermen.

Plaintiffs at this time present no concrete recommendations as to how Defendants should implement the mandate of Congress. Where is the science to support a shorter timeline than the agency proposes? While they are legally correct, Plaintiffs offer no remedy which will produce the desired result. The court is reluctant to issue orders without an adequate technical and scientific foundation. However, the court will not throw up its hands and abdicate its responsibility to see that the will of Congress is met, eventually. For all the above reasons, the court denies Plaintiffs' motion without prejudice. However, defendants are hereby ordered to prepare and submit to the court a schedule for reporting at intervals of a minimum of six months regarding their progress toward implementing the court's previous orders in these cases. This shall be submitted within thirty days of the receipt of this order. Defendants shall continue to report until all provisions of the court's previous orders have been satisfied.

IT IS SO ORDERED.